IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:16-cv-153-F

| | |
|---|---|
| RACHEL SAHOO and GOURAB SAHOO, | )<br>) |
| Plaintiff, | )<br>)<br>) |
| vs. | ) **ORDER**<br>) |
| JAMIE GLEATON and KITTY HART, in<br>their individual and official capacities, | )<br>)<br>)<br>) |
| Defendants. | )<br>)<br>) |

Before the court is the motion to dismiss filed by Jamie Gleaton and Kitty Hart ("Defendants") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. [DE 23]. Plaintiffs Rachel and Gourab Sahoo responded and Defendants replied. [DEs 32, 42]. For the reasons stated below, Defendants' motion is ALLOWED IN PART and DENIED AS MOOT IN PART.

## I. BACKGROUND

Plaintiffs are the parents of a five-year old daughter, MRS, and twin two-year old sons, NES and NGS. This case arises out of a child abuse investigation of Plaintiffs conducted by the Wake County Department of Human Services ("WCHS") and the entry of an order by the Wake County District Court ("state court") temporarily depriving Plaintiffs of the custody of NES and NGS. Am. Compl. ¶¶ 45, 73 [DE 41]. Subsequently, Plaintiffs filed the instant action against Gleaton, an investigator for Wake County Child Protective Services ("CPS"), and Hart, a social worker for WCHS, as a result of their alleged involvement in depriving Plaintiffs of the custody of their boys and of the control of their daughter. Plaintiffs allege a civil rights action under 42 U.S.C. § 1983 (count one), two tort claims (counts two and three) and an alternative claim

under the North Carolina Constitution. The amended complaint is far from a model of clarity –

nor is it a "short and plain statement" as envisioned by Fed. R. Civ. P. 8.[1] Nevertheless, the court

finds the pertinent factual assertions are as summarized below.[2]

## A. NES's Hospital Admission and Medical Examinations[3]

On February 24, 2015, NES – then five months old – was admitted to WakeMed Raleigh

due to breathing difficulty. *Id.* ¶¶ 32-33. The results of an electrocardiogram,

electroencephalogram, heart ultrasound and a brain computerized tomography ("CT") scan were

---

[1] The amended complaint – thirty five pages in length – is disorganized (e.g., party and jurisdiction allegations do not appear until page 6), repetitive and includes numerous factual allegations in a single paragraph. Also, the allegations of wrongdoing by Defendants as currently pled render it difficult, and at times impossible, to ascertain the conduct specific to each defendant. Additionally, Plaintiffs fail to identify in what capacity each claim is brought with the exception of count IV. Finally, they fail to properly identify count three as a claim for obstruction of justice. *See In re Kivett*, 309 N.C. 635, 670, 309 S.E.2d 442, 462 (1983) (stating "[o]bstruction of justice is a common law offense in North Carolina" and observing it "may take a variety of forms"); *see also Blackburn v. Carbone*, 208 N.C. App. 519, 526, 703 S.E.2d 788, 794 (2010) (stating "acts which obstruct, impede or hinder public or legal justice . . . amount to the common law offense of obstructing justice, so that a complaint alleging that the defendants engaged in such activities states a claim for relief").

[2] Defendants' factual summary is entirely one-sided in its presentation and conveniently ignores material factual allegations.

[3] In reviewing a Rule 12(b)(6) motion, courts "may properly take judicial notice of matters of public record," and "may also consider documents attached to the complaint, *see* Fed. R. Civ. P. 10(c), as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic" without converting it into a motion for summary judgment. *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *accord Feldman v. Law Enf't Assocs. Corp.*, 779 F. Supp. 2d 472, 486 n.8 (E.D.N.C. 2011) (noting a court may consider on a Rule 12(b)(6) motion "documents appearing in the record of the case, matters of public record, items subject to judicial notice, matters incorporated by reference into the complaint, and exhibits attached to the complaint whose authenticity is unquestioned") (citing 5B Wright & Miller, Federal Practice & Procedure § 1357). Matters of public record, in this context, have been understood to include "copies of pleadings and other materials filed in other courts." *Caldwell Trucking PRP Group v. Spaulding Composites Co.*, 890 F. Supp. 1247, 1252 (D.N.J. 1995). Exhibits that may be incorporated within the pleadings under Rule 10(c) include documents such as affidavits, letters, contracts and loan documentation. *See Eagle Nation, Inc. v. Market Force, Inc.*, 180 F. Supp. 2d 752, 754 (E.D.N.C. 2001).

In this case, Plaintiffs and Defendant do not include exhibits with either their amended complaint or motion. Plaintiffs, however, attach the following state court filings: (1) Juvenile Petition; (2) Affidavit of Status of Minor Child; (3) Order for Non-Secure Custody and Notice of Hearing; and (4) Order on Need for Continuing Non-Secure Custody and Notice of Next Hearing. *See* Pls.' Resp., Exs. A & B [DEs 29-1; 29-2]. Defendants argue that, in relying on these documents, Plaintiffs address issues beyond the scope of Defendants' motion. Defs.' Reply at 2. Neither the court's background nor discussion cites or relies on the state court filings. That said, Defendants' argument elevates form over substance given the factual allegations in the amended complaint include direct quotations from or summaries of the critical state court filings.

normal. Also, no signs of current or past physical injuries were present. NES tested positive, however, for human metapneumovirus – a virus causing respiratory infections in people of all ages, especially young children.[4] *Id.* ¶ 33. That same day, NES was intubated, transferred to the pediatric intensive care unit ("ICU") and placed on a ventilator. *Id.* ¶ 33, 34. On February 28, 2015, NES was taken off the ventilator and on March 2, 2015, he was moved to a regular medical floor. *Id.* ¶ 34. NES remained placed on monitors, intravascular lines and a feeding tube. *Id.* ¶¶ 34, 35.

On March 4, 2015, Plaintiffs were informed that a second radiologist had reviewed NES's February 24, 2015 CT scan and found "bilateral subdural collections." As a result, NES underwent a full skeletal survey, the results of which indicated "no acute or healing fractures" and "no suspicious calcifications indicating healed fractures." *Id.* ¶ 39. Records from NES's pediatrician also indicated no evidence of injury. *Id.* ¶ 40.

On March 5, 2015, NES underwent a magnetic resonance imaging (MRI) scan, the results of which were interpreted as "probably reflect[ing] small thin subdural hematomas." *Id.* ¶ 41 (alteration in original). A radiologist concluded the MRI results were "consistent with chronic subdural hematomas." *Id.* ¶ 41. A second radiologist reached the same conclusion. *Id.* ¶ 42. On March 6, 2015, NES underwent an ophthalmology examination, which revealed "3-4 [scattered retinal] hemorrhages in one layer of [the] retina, near the back of NES's eye."[5] *Id.* ¶ 44.

On March 6, 2015, WakeMed notified WCHS of NES's medical results in accordance with North Carolina law, and WCHS in turn assigned Gleaton, a WCHS investigator, to investigate the matter. *Id.* ¶¶ 1, 45. That same day, Gleaton "deprived [Plaintiffs] of their

---

[4] *See* https://www.cdc.gov/surveillance/nrevss/hmpv/clinical.html (last visited February 10, 2017).

[5] Plaintiffs do not identify the affected eye.

parental rights" as to all three children and prohibited Plaintiffs from having any contact therewith until further notice by Child Protective Services.[6] *Id.* ¶¶ 2, 50.

## B. Juvenile Petition and State Court Order

On March 9, 2015, Gleaton filed a juvenile petition ("Petition") in state court, alleging NES, NGS and MRS had been physically abused. *Id.* ¶ 3. In the Petition, Gleaton stated that NES's "retinal bleeding coupled with blood in the brain is indicative of traumatic brain injury as a result of [him] having been shaken." *Id.* ¶ 65. Gleaton stated further that despite Plaintiffs' alleged agreement to have no contact with their three children, Ms. Sahoo "continued to appear at the hospital to see" NES and NGS.[7] *Id.* ¶ 69. The Petition also included allegations regarding Ms. Sahoo's "mental health issues" and her "violation of [the] 'safety plan.'" *Id.* ¶¶ 3, 67. The Petition omitted Gleaton's findings contained in the North Carolina Safety Assessment form, wherein she indicated that Plaintiffs were not violent, had not caused NES serious physical harm and had not previously maltreated NES.[8] *Id.* ¶ 63. The Petition also omitted the findings of NGS's medical examinations conducted at WakeMed. *Id.* ¶ 72.

On March 9, 2015, the state court, upon finding "there are no other reasonable means available to protect the children," entered an ex parte order granting WCHS custody of NES and NGS. *Id.* ¶ 4. On March 12, 2015, the state court held a hearing to determine the need for

---

[6] Also, on March 6, 2015, pursuant to Gleaton's directive, Plaintiffs' neighbor delivered NGS to WakeMed to undergo a medical examination. Am. Compl. ¶ 52. Examinations included a pediatric skeletal survey and physical examination on March 6, 2015, an MRI on March 7, 2015 and an ophthalmology examination on March 9, 2015. *Id.* ¶¶ 53-55. The examination and MRI results were normal, evidencing no acute or healing fractures, no suspicious calcifications indicating healed fractures, no neck injuries, no bodily markings of any kind and no retinal bleeding. *Id.* ¶ 53.

[7] According to Plaintiffs, Ms. Sahoo accompanied her neighbor, Jessica Perry, to the hospital on March 8, 2015 to visit with NES and NGS after Perry received a nurse's approval. Approximately 30 minutes later, an unidentified social worker advised Ms. Sahoo and Perry that no visitors were allowed at which point Ms. Sahoo and Perry left the hospital. Am. Compl. ¶ 70.

[8] Gleaton completed this form prior to filing the Petition.

continued custody at which Gleaton testified. *Id.* ¶ 5. Based on Gleaton's testimony, the court entered an order requiring NES and NGS to remain in WCHS's custody, finding "efforts to prevent the need for the children's placement were precluded by an immediate threat of harm to the children" and "no other reasonable means [were] available to protect the children." *Id.* The state court did not grant WCHS custody of MRS.[9] *Id.* ¶¶ 4, 7.

Between March 9, 2015 and May 22, 2015 ("custody period"), Gleaton, and Kitty Hart – a social worker assigned to the custody matter on March 20, 2015 – exercised control over Plaintiffs' relationship with their children. The children resided at Plaintiffs' home with their maternal grandmother while Plaintiffs resided in an apartment. *Id.* ¶¶ 8, 57, 82, 84. Gleaton and Hart limited Plaintiffs' visits with all three children "to a handful of ... hours per week" with visitations generally limited to two hours or less and under CPS's direct supervision and observation. *Id.* ¶ 9-10, 76-77. CPS's supervision included "critique[s]" of Plaintiffs' interactions with their children. *Id.* ¶¶ 10, 77.

On an unspecified date in May 2015, pediatricians with Duke Medical Center completed a Child Medical Examination of NES, finding the WakeMed medical records did not support the conclusion that NES had been physically abused. *Id.* ¶ 11. Rather, these pediatricians concluded NES's symptoms "were consistent with natural causes" and "the fact he had been intubated on a breathing machine ... for almost a week." *Id.* On May 22, 2015, the state court dismissed the Petition and all three children were returned to Plaintiffs' custody and care. *Id.* at 12.

---

[9] On March 24, 2015, Defendants received affidavits from seven people, each generally attesting to the positive parent-child relationship between Plaintiffs and their children. Am. Compl. ¶ 80. That same day, Defendants learned that Plaintiffs' polygraph results indicated Plaintiffs answered truthfully in denying that they had ever shaken or physically injured NES. *Id.* ¶ 78.

## II. APPLICABLE LAW

### A. Standard of Review

To state a claim for relief, a pleading must contain "a short and plain statement of the claim showing the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint, not to resolve conflicts of fact or to decide the merits of the action. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999). In evaluating a 12(b)(6) motion, a court accepts all well-pled facts in the complaint as true and construes those facts in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Adcock v. Freightliner LLC*, 550 F.3d 369, 374 (4th Cir. 2008). Legal conclusions, recitations of the elements of a cause of action, and bare assertions devoid of further factual enhancement do not constitute well-pled facts for Rule 12(b)(6) purposes. *See Iqbal*, 556 U.S. at 678.

### B. 42 U.S.C. § 1983 and the Due Process Clause

Section 1983 is not a source of substantive rights. Instead, it provides a remedy to redress violations of federal law grounded in federal constitutional provisions or statutes. *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979). In order to state a claim under § 1983, a plaintiff must allege "(1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997); *accord West v. Atkins*, 487 U.S. 42, 48 (1988). Here, the § 1983 claims against Defendants are for the alleged deprivation of "due process of law."

The Due Process Clause of the Fourteenth Amendment to the United States Constitution affords both procedural and substantive due process of law. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). "[T]he Constitution recognizes both a protectible [sic] procedural due process interest in parenting a child and a substantive fundamental right to raise one's child." *Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000).

To state a substantive due process claim, a plaintiff must allege (1) a liberty (or property) interest; (2) the deprivation of that interest by the state; and (3) "the state's action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency." *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 827 (4th Cir. 1995); *accord Acorn Land, LLC v. Balt. Cnty.*, 402 Fed. App'x 809, 819 (4th Cir. 2010). In the context of executive action, as here, substantive due process "protects against government power arbitrarily and oppressively exercised." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) ("Our cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be arbitrary in the constitutional sense . . . ."). "[T]he cognizable level of executive abuse of power [is] that which shocks the conscience." *Cty. of Sacramento*, 523 U.S. at 846; *accord Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990). An executive act is "conscience-shocking [or] arbitrary in the constitutional sense . . . [when it is] not only wrong, but egregiously so by reason of its abusive or oppressive purpose and its lack of justification by any government interest."[10] *Hawkins v. Freeman*, 195 F.3d 732, 744 (4th Cir. 1999).

---

[10] *See Rucker v. Harford Cnty.*, 946 F.2d 278, 281 (4th Cir. 1991) (explaining substantive due process extends only "to state action so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies").

To state a procedural due process claim, a plaintiff must allege: "(1) a cognizable liberty or property interest; (2) the [intentional][11] deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *Kendall v. Balcerzak*, 650 F.3d 515, 528 (4th Cir. 2011) (alteration and footnote added). Procedural due process generally requires notice and an opportunity to be heard. *See id.* at 528-29.

## C. Absolute and Qualified Immunity

While § 1983 does not mention immunities, the United States Supreme Court has read the statute "in harmony with general principles of tort immunities and defenses rather than in derogation of them." *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976). Courts recognize two forms of immunity under § 1983 – qualified and absolute. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) ("Congress did not intend § 1983 to abrogate immunities well grounded in history and reason."). These forms of immunity, however, "do[] not extend beyond [the] scope that existed at common law in 1871, when § 1983['s predecessor] was enacted,[12] nor do[] [they] persist unless the policy behind the common-law rule is still applicable." *Lampton v. Diaz*, 639 F.3d 223, 226 (5th Cir. 2011) (footnote added); *see Malley v. Briggs*, 475 U.S. 335, 340 (1986) (stating "while we look to the common law for guidance, we do not assume that Congress intended to incorporate every common-law immunity into § 1983 in unaltered form").

"The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties."[13] *Burns v. Reed*, 500 U.S. 478, 486-87

---

[11] *See Daniels v. Williams*, 474 U.S. 327, 328 (1986) ("[T]he Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property.").

[12] *See Butz v. Economou*, 438 U.S. 478, 502 (1978) (describing "Section 1 of the Civil Rights Act of 1871" as "the predecessor of § 1983").

[13] *See Buckley*, 509 U.S. at 268 ("In most cases, qualified immunity is sufficient to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official

(1991). That said, certain officials – judges, legislators, prosecutors and trial witnesses[14] – perform "special functions" such that they "require a full exemption from liability" based on common-law forms of immunity in place when Congress enacted the Civil Rights Act of 1871.[15] *Butz*, 438 U.S. at 508. State agency officials "performing certain functions analogous to those of a prosecutor [or judge]" have absolute immunity as well – "their immunities being termed [quasi-prosecutorial and] quasi-judicial," respectively. *Imbler*, 424 U.S. at 409 n.20 (first alteration added); *see Harlow v. Fitzgerald*, 457 U.S. 800, 811 n.16 (1982) (discussing *Butz* and noting it extended absolute immunity to officials "engaged in quasi-prosecutorial functions").

"The official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Buckley*, 509 U.S. at 269. Once a court determines that an official was functioning in a core judicial or prosecutorial capacity, absolute immunity applies "however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff." *Cleavinger v. Saxner*, 474 U.S. 193, 199-200 (1985).

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *Perry v. Pamlico Cnty.*, 88

---

authority."); *Malley*, 475 U.S. at 341 (explaining qualified immunity protects all government officials, except for those who are "plainly incompetent or those who knowingly violate the law").

[14] *See Rehberg v. Paulk*, 566 U.S. 356, 363 (2012) (observing "the following functions . . . are absolutely immune from liability for damages under § 1983: actions taken by legislators within the legitimate scope of legislative authority; actions taken by judges within the legitimate scope of judicial authority; actions taken by prosecutors in their role as advocates; and the giving of testimony by witnesses at trial") (internal citations omitted); *accord Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985).

[15] Relevant here, prosecutorial immunity ensures prosecutors can independently perform their public duties free from the fear that their actions might give rise to civil liability, *see Imbler,* 424 U.S. at 423 (discussing the "concern [at common law] that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties"), while judicial immunity provides the liberty to "exercise their functions with independence and without fear of consequences." *Pierson v. Ray*, 386 U.S. 547, 554 (1967) (explaining fear of litigation "would contribute not to principled and fearless decision-making [by judges] but to intimidation").

F. Supp. 3d 518, 538 (E.D.N.C. 2015) ("Qualified immunity can apply to social workers involved in child abuse and custody cases.") (citation omitted). To determine whether a defendant's conduct is covered by qualified immunity, a court "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *Wilson v. Layne*, 526 U.S. 603, 609 (1999). If so, the court considers "whether the constitutional right violated was clearly established in the specific context of the case"[16] – that is, whether "the contours of a right are sufficiently clear" that a reasonable person in the defendant's position would have known that his or her actions violated that right. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Although a case exactly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*; *see McKee v. Hart*, 436 F.3d 165, 171 (3d Cir. 2006) (stating a right is clearly established if there is "sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put the defendant on notice that his or her conduct is constitutionally prohibited").

### D. Immunity and Social Workers

Because social workers play an integral role in the judicial process, some courts, including the Fourth Circuit, have extended absolute immunity to social workers and child protective services investigators performing quasi-prosecutorial and quasi-judicial functions connected with the initiation and pursuit of child protection proceedings.[17] *See Vosburg v. Dep't of Soc. Servs.*, 884 F.2d 133, 138 (4th Cir. 1989) (holding social workers absolutely immune

---

[16] *Merchant v. Bauer*, 677 F.3d 656, 662 (4th Cir. 2012).

[17] *See also Ernst v. Child & Youth Servs.*, 108 F.3d 486, 495 (3d Cir. 1997); *Kurzawa v. Mueller*, 732 F.2d 1456, 1458 (6th Cir. 1984); *Millspaugh v. Cnty. Dep't of Public Welfare*, 937 F.2d 1172, 1176 (7th Cir. 1991); *Meyers v. Contra Costa Cnty. Dep't of Social Servs.*, 812 F.2d 1154, 1157 (9th Cir. 1987); *but see Williams v. Hauser*, 948 F. Supp. 164, 166 (D. Conn. 1996) (holding "the removal of a child, while not investigative, is not so intimately associated with the adjudicative process to justify absolute immunity").

from liability resulting from a decision to file a removal petition, which was deemed prosecutorial, but not immune for investigating whether a removal petition should be filed);[18] *Evans v. Perry*, 578 Fed. App'x 229, 232 (4th Cir. 2014) (stating absolute immunity to social workers "extends only to prosecutorial actions . . . including preparing and filing a removal petition and prosecuting that action"). The extension of absolute immunity to social workers for such functions is premised on a social worker's advocacy for the health and well-being of children. *See, e.g., Kurzawa*, 732 F.2d at 1458 (stating social workers, like prosecutors, "must be able to perform the necessary tasks to achieve this goal without the worry of intimidation and harassment from dissatisfied parents"); *Meyers*, 812 F.2d at 1157 (stating a "social worker's independence . . . would be compromised were the social worker constantly in fear that a mistake could result in a time-consuming and financially devastating civil suit").

Consistent with Supreme Court precedent, courts granting social workers absolute immunity employ a "functional approach" that examines the particular wrongs the defendant is alleged to have committed rather than one based purely on the status of the defendant. *Cleavinger*, 474 U.S. at 201-02. That is, these courts look to the particular task the social worker performed and its nexus to the judicial process rather than deciding that social workers as a class are entitled to absolute immunity. *See id.* at 201 (stating it is "the nature of the responsibilities of the individual official" that is determinative of absolute immunity – not the public official's role or title); *Butz*, 438 U.S. at 513 (noting a court must consider whether the actions taken by the

---

[18] *Vosburg* concerned a social worker's actions taken pursuant to Virginia law. *See Preston v. McDowell Cnty.*, No. 1:05-CV-343, 2006 WL 3434928, at *7 (W.D.N.C. Nov., 8, 2006), *mem. and recommendation adopted by* 2006 WL 3434928 (W.D.N.C. Nov. 28, 2006) (observing "[t]here is no substantive difference between the Virginia child removal statute underlying *Vossberg* [sic] and the North Carolina statutes permitting petitions for non-secure custody") (citing N.C. Gen. Stat. § 7B-503 *et seq.*, Va. Code § 16.1-252).

official are "functionally comparable" to that of a judge or prosecutor).[19]

---

[19] The Supreme Court has not addressed whether social workers are afforded absolute immunity from § 1983 liability for their quasi-prosecutorial actions. That said, in *Hoffman v. Harris*, 511 U.S. 1060 (1994), Justice Thomas, with whom Justice Scalia agreed, criticized appellate court cases, including *Vosburg*, for extending absolute immunity to social workers for such acts, stating

> an official seeking [absolute] immunity must . . . at the outset show that a "counterpart to the privilege he asserts" was recognized at common law in 1871.
>
> The courts that have accorded absolute immunity to social workers appear to have overlooked the necessary historical inquiry; none has seriously considered whether social workers enjoyed absolute immunity for their official duties in 1871. If they did not, absolute immunity is unavailable to social workers under § 1983. This all assumes, of course, that "social workers" (at least as we now understand the term) even existed in 1871. If that assumption is false, the argument for granting absolute immunity becomes (at least) more difficult to maintain.
>
> It may be argued that . . . [these] courts have effectively identified a common law counterpart to the modern social worker for purposes of the immunity analysis: the 1871 prosecutor. In reasoning that the social worker functions as a prosecutor in performing certain duties, these courts essentially have suggested that, by analogy, the historically-rooted immunity for prosecutors should apply to social workers. In the absence of a detailed examination of the immunity (if any) that applied to social workers in 1871, however, such an analogy must be suspect. . . . I am not convinced that social workers, who often are involved in civil family welfare proceedings, can ever function as prosecutors for purposes of § 1983 immunity analysis.
>
> Of course, the . . . decisions granting absolute immunity to social workers may be premised more on the notion that absolute immunity serves important policy concerns than on either historical or functional analyses. To the extent they are so based, they are misguided: The federal courts "do not have a license to establish immunities from § 1983 actions in the interests of what [they] judge to be sound public policy."
>
> We should address the important threshold question whether social workers are, under any circumstances, entitled to absolute immunity. Accordingly, I respectfully dissent.

*Id.* (Thomas, J., dissenting from denial of certiorari) (internal citations omitted).

The court's brief research strongly indicates the term "social worker" as defined today did not exist in 1871. *See* Basyle J. Tchividjian, Catching American Sex Offenders Overseas: A Proposal for A Federal International Mandated Reporting Law, 83 UMKC L. Rev. 687, 692 (2015) (stating "[f]ormalized child protection" did not exist in 1871 and noting the "modern era" of child protection began in 1962). That said, the act of child advocacy most certainly did exist. *See* John E.B. Myers, A Short History of Child Protection in America, 42 Fam. L.Q. 449, 450 (Fall 2008) (stating "[c]riminal prosecution has long been used to punish egregious [child] abuse and citing cases from the early 1800s"); Tchividjian, *supra* (observing in some states, magistrates were granted authorization to remove children from unfit homes prior to the era of privatized child protection). Thus, the function at issue – assisting the judicial process in protecting a child's welfare – existed in 1871. That the term "social worker" did not is irrelevant. *See Cleavinger*, 474 U.S. at 201-02; *see also Preston*, 2006 WL 3434928, at *7 (observing "the words used to describe the people involved in the judicial process have evolved"). Accordingly, the court is not swayed by Justice Thomas' dissent.

### E. North Carolina Juvenile Law[20]

Under North Carolina law, a doctor who suspects child abuse or neglect must report the alleged abuse to social services. *See* N.C. Gen. Stat. § 7B-301. Within 24 hours of a child abuse report, social services must "make a prompt and thorough assessment . . . in order to determine whether protective services should be provided or the complaint filed as a petition." *Id.* § 7B-302(a); *see* 10A N.C.A.C. § 70A.0112(a), (b)(2) (explaining the director of the county department of social services "shall maintain . . . a case record on a child for whom protective services are initiated," including, *inter alia*, "safety assessments"). If an assessment indicates abuse, social services must consider whether the "immediate removal" of the child "or any other" children from parental custody and control is "necessary for their protection," *Id.* § 7B-302(c), and if so, "sign a petition [for an order of nonsecure custody] that alleges the applicable facts to invoke the jurisdiction of the court."[21] *Id.* "Where the assessment shows that it is warranted, a protective services worker may assume temporary custody of the juvenile for the juvenile's protection." *Id.*; *see id.* § 7B-500(a) (defining temporary custody as "the taking of physical custody and providing personal care and supervision until a court order for nonsecure custody can be obtained").[22]

Upon receipt of a petition, the state court considers whether there is a reasonable factual basis to believe the matters alleged [therein] are true." *Id.* § 7B-503(a). If the court so finds, the

---

[20] The parties fail to provide any meaningful discussion regarding North Carolina juvenile protection law.

[21] *See* N.C. Gen. Stat. § 7B-402 (identifying what a petition must include); *Id.* § 7B-403 ("[I]if it is determined by the director that a [child abuse] report should be filed as a petition, the petition shall be drawn by the director [and] verified . . . .").

[22] Social Services may take a child into temporary custody if (1) "there are reasonable grounds to believe that the juvenile is abused;" and (2) "the juvenile would be injured or could not be taken into custody if it were first necessary to obtain a court order." *Id.* § 7B-500(a); *see also* 10A N.C.A.C. § 70A.0110 (explaining when a "county department of social services worker may take a child into temporary custody").

child is placed in nonsecure custody.[23] *See id.* (providing the allegedly abused juvenile is placed in nonsecure custody "when there is a reasonable factual basis to believe that there are no other reasonable means available to protect the juvenile"). Within seven days of placing the juvenile in nonsecure custody, the state court must hold a "hearing on the merits or a hearing to determine the need for continued custody," during which the court may "receive testimony." *Id.* § 7B-506(a) (providing hearing may be continued up to 10 days with consent of the juvenile's custodian), (b). If the court determines continued custody is warranted, it must issue an order "with appropriate findings of fact."[24] *Id.* § 7B-506(d). The court must hold a second hearing on continued custody within seven business days of the initial hearing, with hearings thereafter "held at intervals of no more than 30 calendar days." *Id.* § 7B-506(e).

### III. DISCUSSION

#### A. § 1983 Claim against Gleaton and Hall in their Individual Capacities[25]

Plaintiffs contend the taking of their children into custody was unconstitutionally infirm under the Due Process Clause. Specifically, Plaintiffs allege that "[t]he state's removal of a child from his parents constitutes an interference with a liberty interest of the parents and thus triggers

---

[23] *See* N.C. Gen. Stat. § 7B-502 (providing "[t]he order for nonsecure custody may be entered ex parte").

[24] *Id.* § 7B-505(b) (explaining upon a court's determination that a juvenile should be placed in nonsecure custody, the court may place the juvenile with, *inter alia*, a relative if "the court finds that the relative is willing and able to provide proper care and supervision in a safe home"); *id.* § 7B-905.1(c) ("If the juvenile is placed or continued in the custody or guardianship of a relative . . . , any order providing for visitation shall specify the minimum frequency and length of the visits and whether the visits shall be supervised.").

[25] Plaintiffs do not and indeed cannot bring a § 1983 claim against Gleaton and Hall in their official capacities. An official capacity claim against a governmental official is treated as a suit against the government entity of which the official is an agent. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985). "The capacity of a governmental body to be sued in the federal courts is governed by the law of the state in which the district court is held." *Avery v. Burke Cnty.*, 660 F.2d 111, 114 (4th Cir. 1981) (citing FED. R. CIV. P. 17(b)). Barring statutory authorization, "the capacity to be sued [in North Carolina] exists only in persons in being." *McPherson v. First & Citizens Nat. Bank of Elizabeth City*, 240 N.C. 1, 18, 81 S.E.2d 386, 397 (1954); *see, e.g.*, N.C. Gen. Stat. § 153A-11 (providing that a county is a legal entity subject to suit). As WCHS is an agency or department of Wake County, it lacks the legal capacity to be sued. *See, e.g., Moua v. Alexander Cnty.*, 2012 U.S. Dist. LEXIS 8916, at *17 (W.D.N.C. Jan. 26, 2012) (dismissing § 1983 claims against Alexander County Department of Social Services on grounds that county agency was not a legal entity subject to suit) (citations omitted).

the procedural protections of the Fourteenth Amendment." Am. Compl. ¶ 88.

It is undisputed that Defendants – state actors – removed the Sahoo children from the custody and control of Plaintiffs – their natural parents. In this context, the Supreme Court has recognized the right to family integrity and privacy as a fundamental liberty interest protected by the Fourteenth Amendment.[26] Accordingly, the court finds Plaintiffs sufficiently allege a constitutionally protected liberty interest and the deprivation of that interest by a state actor.

It is unclear, however, on which component of due process Plaintiffs rely. The amended complaint does not mention "substantive due process" or "procedural due process" nor does it expressly allege the elements and supporting facts associated with either. Plaintiffs include only boilerplate allegations concerning the denial of their parental liberty right "without due process of law." Am. Compl. ¶¶ 89, 94, 96; *see id.* ¶ 88 (citing cases in support of the unremarkable proposition that the removal of a child from his parents "triggers the procedural protections of the Fourteenth Amendment"). With respect to procedural due process, Plaintiffs have not, for example, expressly alleged a lack of notice or opportunity to be heard as to any acts taken by Defendants. As for substantive due process, there are no express allegations that Defendants engaged in "arbitrary," "oppressive" or conscience-shocking conduct.

While the Constitution confers both substantive and procedural rights on parents,[27] it is not apparent that Plaintiffs appreciate this distinction. *See Bartell v. Lohiser*, 215 F.3d 550, 557

---

[26] *See Troxel*, 530 U.S. at 65 (stating the parental liberty interest "is perhaps the oldest of the fundamental liberty interests recognized by this Court"); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (there is "a fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) (recognizing a parental liberty interest in the "custody, care and nurture of the child"); *see also Hodge v. Jones*, 31 F.3d 157, 163 (4th Cir. 1994) (recognizing the right to familial integrity and privacy).

[27] *Kia P. v. McIntyre*, 2 F. Supp. 2d 281, 290 (E.D.N.Y. 1998) ("The liberty interests of parent and child in continued care and companionship has both procedural as well as substantive elements."); Plaintiffs do not mention the substantive component of due process in their amended complaint. *See* Am. Compl. ¶ 88 (stating alleged misconduct of Defendants "trigger[ed] the procedural protections of the Fourteenth Amendment).

(6th Cir. 2000) ("[T]he differences between the procedural interest in raising one's child and the substantive right, and the corresponding scope of the duties imposed on government, are significant."). Procedural due process examines the means by which an outcome is obtained.[28] Substantive due process, however, "forbids the government to infringe . . . fundamental liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest."[29] *Wash. v. Glucksberg*, 521 U.S. 702, 721 (1997). Giving Plaintiffs the benefit of the doubt, the court assumes Plaintiffs intends to pursue both claims. *See, e.g.*, Am. Compl. ¶ 94 (alleging denial of "their rights to a fair judicial proceeding"); *id.* ¶ 95 (alleging deprivation of their right to the custody and control of MRS despite the lack of a custody order). The court, however, will not undertake counsel's job and thus declines to engage in the task of matching factual allegations with inadequately pled claims.[30]

---

[28] *See Mora v. City of Gaithersburg*, 519 F.3d 216, 230 (4th Cir. 2008) (stating "a guarantee of fair procedures . . . typically means notice and an opportunity to be heard") (internal citation omitted); *see Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.") (quotation marks omitted); *cf. Santosky*, 455 U.S. at 755 ("The minimum requirements [of procedural due process] being a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action.") (alteration in original).

[29] *See Stanley v. Illinois*, 405 U.S. 645, 652 (1972) (noting a state's interest in the safety of children in its jurisdiction thereby permitting the separation of "neglectful parents" from their children); *Martin v. St. Mary's Dep't of Soc. Servs.*, 346 F.3d 502, 506 (4th Cir. 2003) ("A state has a legitimate interest in protecting children from neglect and abuse . . . . Because of the complicated balance between parents' rights to raise their children and a State's interest in protecting its minor citizens, the right to familial integrity is 'amorphous' in many cases."); *Miller v. City of Philadelphia*, 174 F.3d 368, 373 (3d Cir. 1999) (observing parental liberty interest "must be balanced against the state's interest in protecting children suspected of being abused"); *Bartell*, 215 F.3d at 558 (stating "in certain narrowly-defined circumstances, the [s]tate's interest in a child's well-being may supersede that of a parent").

[30] Plaintiffs also fail to state a claim for conspiracy. To a state a claim for conspiracy under § 1983, a plaintiff must plead facts that establish defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996) (alteration added); *accord Massey v. Ojaniit*, 759 F.3d 343, 357-58 (4th Cir. 2014). Moreover, a plaintiff must allege facts establishing "an agreement or a 'meeting of the minds' by defendants to violate the [plaintiff's] constitutional rights." *Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995) (alteration added).

Here, assuming Defendants are not entitled to absolute immunity for one or more of their acts or omissions, the conspiracy claim nevertheless fails. Plaintiffs' conspiracy allegation is limited to the bare, unadorned assertion that Gleaton and Hart "conspired" with each other. Plaintiffs have not alleged any facts to support a shared

Because Plaintiffs' opposition brief demonstrates a misunderstanding of immunity law, the court takes this opportunity to make two findings. First, the court finds absolute immunity shields Gleaton from her alleged misconduct regarding the Petition and her state court testimony. *See* Am. Compl. ¶¶ 61-63, 65, 67, 69, 71-72 (stating Gleaton provided false, incomplete and misleading statements in the Petition and in testimony before the state court and omitted "exculpatory information" from the Petition). Gleaton acted as a legal advocate in initiating court proceedings and testifying under oath. As these actions are intimately associated with the judicial phase of a juvenile proceeding, Gleaton is entitled to absolute immunity. *See Vosburg*, 884 F.2d at 137.

Second, under Fourth Circuit law, Gleaton remains so entitled even under allegations that she intentionally misrepresented or omitted facts in the Petition or during her testimony. *See Booker v. S.C. Dep't of Soc. Servs.*, 583 Fed. App'x 147, 148 (4th Cir. 2014) (absolute immunity for social worker who "made intentional misstatements" in removal petition and during removal hearing).[31] In arguing to the contrary, Plaintiffs ignore the fact that absolute immunity "attaches to [the advocate's] function, not to the manner in which he [or she] performed it." *Barrett v.*

---

conspiratorial purpose. *See Brown v. Angelone*, 938 F. Supp. 340, 346 (W.D.Va. 1996) ("The plaintiff must allege facts which show that the defendants shared a unity of purpose or common design to injure plaintiff.") (internal citations omitted). The mere fact that Gleaton and Hart each played a part in the events at issue is not sufficient to draw the reasonable inference that Defendants had any agreement to violate Plaintiffs' civil rights.

[31] *See also Burns v. Reed*, 500 U.S. 478, 489-90 (1991) (stating "prosecutors and other lawyers were absolutely immune from damages liability at common law for making false or defamatory statements in judicial proceedings"); *Malachowski v. City of Keene*, 787 F.2d 704, 712 (1st Cir. 1986) (absolute immunity for a juvenile officer who allegedly filed false delinquency petition); *Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 725 (6th Cir. 2011) (absolute immunity for social worker who made false or misleading statements in complaint and affidavit submitted to court); *Gedrich v. Fairfax Cnty. Dep't of Family Servs.*, 282 F. Supp. 2d 439, 467 (E.D. Va. 2003) (absolute immunity for child protective services worker who "knowingly" included false statements in affidavit); *but see Millspaugh v. Cnty. Dep't of Public Welfare*, 937 F.2d 1172, 1176 (7th Cir. 1991) (holding social workers not absolutely immune from claims they made false statements in a petition or application for custody orders and reasoning the filing of a petition is similar to an officer filing an affidavit seeking a warrant) (citing *Malley v. Briggs*, 475 U.S. 335 (1986)); *accord Beltran v. Santa Clara Cnty.*, 514 F.3d 906, 908 (9th Cir. 2008).

*United States*, 798 F.2d 565, 573 (2d Cir. 1986); *see Forrester v. White*, 484 U.S. 219, 227 (1988) (stating "immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches") (emphasis in original). However unjust it may seem to shield knowingly false conduct from liability, and "no matter how undesirable the results . . . , absolute immunity represents a balance between . . . evils [as it] has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Imbler*, 424 U.S. at 428 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2nd Cir. 1949)).

## B.  State Law Claims[32]

The court declines to consider the adequacy of Plaintiffs' state law claims as currently pled under Rule 12(b)(6). The court is obligated to examine the functions each defendant performed; however, those functions are unclear as presently alleged. The court will not speculate as to the exact nature of a given claim or the allegations associated with a given defendant. Moreover, the verbose and repetitious pleading arguably prevented the parties from cogently and succinctly briefing their respective positions. *See United States v. Keplinger*, 776 F.2d 678, 683 (7th Cir. 1985) (observing "excess verbiage" makes it "far more likely that meritorious arguments will be lost amid the mass of detail"). Indeed, it appears Defendants' memorandum prompted Plaintiffs' attempt to clarify their pleading in their opposition brief. *See* Pls.' Resp. at 3-4 (providing a two-page summary of the relevant actions/decision and by whom

---

[32] "[F]ederal courts are courts are courts of limited jurisdiction." *McQuillen v. Nat'l Cash Register Co.*, 112 F.2d 877, 881 (4th Cir. 1940). This court can decline to continue the action as to any pendent state claims if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995) ("trial courts enjoy wide latitude in determining whether . . . to retain jurisdiction over state claims when all federal claims have been extinguished"). Because the court has not dismissed the federal claim over which it has original jurisdiction, the court may retain jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) (explaining decision to exercise supplemental jurisdiction is discretionary); 28 U.S.C. § 1367(d).

such actions/decisions were taken). Plaintiffs' brief, however, does little to clarify facts pertinent to each defendant. A more streamlined complaint containing greater specificity serves the interests of everyone involved.

## IV. CONCLUSION

For the foregoing reasons, it is ORDERED as follows:

1. Defendants' motion is ALLOWED IN PART and DENIED AS MOOT IN PART. Specifically, Count 1 is DISMISSED with prejudice as to Gleaton's alleged misconduct regarding the Petition and her state court testimony. In all other respects, Defendants' motion is DENIED AS MOOT. Defendants may renew their motion as set forth below.

2. Plaintiffs shall file an amended pleading in conformity with this Order and consistent with *Twombly* and its progeny **no later than April 24, 2017**. Plaintiffs shall clearly designate each claim and the facts pertinent to each claim. Plaintiff shall also allege with clarity the factual allegations pertinent to each defendant.

3. The amended pleading shall be designated the "Second Amended Complaint."

4. Defendants shall answer or otherwise respond to the Second Amended Complaint within 14 days after service of the Second Amended Complaint.[33]

SO ORDERED.

This the 23rd day of March, 2017.

*James C. Fox*
JAMES C. FOX
Senior United States District Judge

---

[33] *See* FED. R. CIV. P. 15(a)(3).