# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA

## Case No.: 5:16-cv-00153-BO

RACHEL SAHOO and GOURAB SAHOO,
    Plaintiffs,

vs.

JAMIE GLEATON, in her individual capacity,
KITTY HART, in her individual capacity,
RICHARD HAYNER, in his individual and
supervisory capacities, SWEETLY SANDERS, in
her individual and supervisory capacities, and
UNKNOWN JOHN DOE SUPERVISORS AND
POLICYMAKERS 1-10, in their individual,
supervisory and official capacities, and WAKE
COUNTY.

    Defendants.

### FOURTH AMENDED COMPLAINT

(Jury Trial Demanded)

Plaintiffs RACHEL SAHOO and GOURAB SAHOO, by and through undersigned counsel, complain of Defendants JAMIE GLEATON, KITTY HART, RICHARD HAYNER, SWEETLY SANDERS, UNKNOWN JOHN DOE SUPERVISORS AND POLICYMAKERS 1-10, and WAKE COUNTY as follows:

## PARTIES

1.    Plaintiffs Rachel and Gourab Sahoo are individuals who currently reside in the state of Florida. They are the parents of NES, NGS and MRS. At all times relevant to this Complaint, plaintiffs were residents of Wake County, North Carolina.

1

2.     Defendant Jamie Gleaton was at all times relevant to this Complaint a child abuse investigator for Wake County Child Protective Services, and was acting under color of state law within the scope of her employment as a public employee. Upon information and belief, Gleaton resides in the Eastern District of North Carolina.

3.     Upon information and belief, defendant Gleaton does not have a law degree and has never attended law school.

4.     Defendant Kitty Hart was at all times relevant to this Complaint a social worker for Wake County Human Services, Foster Care and Permanency Planning, and was acting under color of state law within the scope of her employment as a public employee. Upon information and belief, Hart resides in the Eastern District of North Carolina.

5.     Upon information and belief, defendant Hart does not have a law degree and has never attended law school.

6.     Upon information and belief, defendant Richard Hayner was at all times relevant to this Complaint Jamie Gleaton's direct supervisor within Wake County Child Protective Services and was acting under color of state law within the scope of his employment as a public employee. Upon information and belief, Hayner resides in the Eastern District of North Carolina.

7.     Upon information and belief, defendant Hayner does not have a law degree and has never attended law school.

8.     Upon information and belief, defendant Sweetly Sanders was at all times relevant to this Complaint Kitty Hart's direct supervisor within Wake County Human Services, Foster Care and Permanency Planning, and was acting under color of state law within the scope of her employment as a public employee.  Upon information and belief, Sanders resides in the Eastern District of North Carolina.

9.     Upon information and belief, defendant Sanders does not have a law degree and has never attended law school.

10.     Unknown defendants John Doe Supervisors, Policymakers and Officials were at all times relevant to this Complaint employees of the Wake County Department of Human Services and were supervising investigations of suspected child abuse in Wake County.  At all times relevant to this Complaint they were acting under color of state law in their individual, supervisory or official capacities within the scope of their employment.  Their identities and conduct are currently undetermined, and it will require further discovery to identify these individuals, their specific acts, and their specific omissions.

11.     Defendant Wake County is a municipal corporation organized under the laws of the State of North Carolina.  The Wake County Department of Human Services is, and was at all times pertinent to this action, a department of the defendant Wake County.

## **JURISDICTION**

12.     This Court has federal question jurisdiction, pursuant to 28 U.S.C. §1331, over claims arising under 42 U.S.C. §1983.

3

13.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because they are part of the same case and controversy described by Plaintiffs' federal claims, and independent original jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

## VENUE

14.     Pursuant to 28 U.S.C. §1391(b)(2), venue is proper in the Eastern District of North Carolina, the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

15.     Venue is also proper in the Eastern District of North Carolina pursuant to 28 U.S.C. §1391(b)(1), as, upon information and belief, all defendants reside within the Eastern District of North Carolina.

## JURY DEMAND

16.     Pursuant to the Seventh Amendment of the United States Constitution, Plaintiffs hereby request a jury trial on all issues and claims set forth in this Complaint.

## FACTUAL ALLEGATIONS

### Background

17.     Rachel Sahoo was born in Miami in 1982.

18.     Her father was the national director of the Simon Wiesenthal Center, and her mother, whose parents were Holocaust survivors, worked as a pre-school teacher.

19.     After graduating from college, Rachel worked at a law firm, then moved to North Carolina and worked at IBM in Human Resources.

20.     Gourab Sahoo was born in India in 1980.

21.     His father was a banker and his mother a housewife.

22.     Gourab completed his bachelor's degree in engineering in 2003, and began working as an IT engineer.

23.     Rachel and Gourab met in 2007, when they lived in the same building in New Jersey, moved to North Carolina, and were married in 2009.

24.     Rachel and Gourab's first child, a daughter they named MRS, was born in 2011.

25.     MRS was seen regularly by a pediatrician, and apart from some allergies, was a healthy and happy child.

26.     MRS was never hospitalized, and never suffered any serious or unusual physical injuries.

27.     NES and NGS were born in 2014, four weeks early.

28.     NES was born with an inguinal hernia and had to have surgery, with general anesthesia, when he was only 9 days old.

29.     When NES was five weeks old, he was diagnosed with Pyloric Stenosis,

5

again had surgery, with general anesthesia, and spent four days at WakeMed Hospital.

30.     The same pediatrician who saw MRS also saw NES and NGS.

31.     NES and NGS were examined at their 2-month and 4-month well checks, and were found to be perfectly healthy, with no concerns regarding their physical condition or their developmental progress.

**NES's Admission to Wake Medical Center - February 24, 2015**

32.     In February 2015, Rachel took MRS to the pediatrician to be treated for a virus.

33.     By around February 19, 2015, both NGS and NES had caught the virus.

34.     NES's symptoms were worse than NGS's, and on Saturday, February 21, 2015, after unsuccessfully calling her pediatrician's after-hours answering service, Rachel brought NES to the Apex WakeMed emergency room.

35.     The doctor at Apex WakeMed examined NES, did not note any physical injuries, determined he was not dehydrated or lethargic, and sent him home with Rachel.

36.     On Monday, February 23, Rachel took both NES and NGS to see their regular pediatrician.

37.     He examined both boys, found no physical injuries, determined that NGS had an ear infection, and diagnosed NES with a virus.

38.     On the morning of Tuesday, February 24, 2015, NES began having trouble breathing and at one point went limp.

6

39.     Rachel and Gourab called 911, and the EMT's transported NES, accompanied by Rachel, to WakeMed Raleigh.

40.     When they arrived at WakeMed Raleigh, NES was still having trouble breathing, was put on a ventilator, and was examined extensively.

41.     NES was given an EKG, an EEG, a heart ultrasound, and a CT scan of his brain; all came back as normal.

42.     NES was given a complete physical examination, and no physical injuries, bruises, or other signs of past physical injuries were present.

43.     When a full virus panel disclosed that NES was suffering from metapneumovirus (MPV), which can cause severe respiratory distress (acute bronchiolitis), especially in infants, he was admitted to the Pediatric Intensive Care Unit (PICU).

**NES's Treatment at Wake Medical Center - February 24 - March 6, 2015**

44.     NES remained intubated on a ventilator from February 24 until February 28, 2015, and remained in the PICU until March 2, 2015, when he was moved to a regular room.

45.     Even after he was removed from the ventilator, NES remained hooked up to various monitors, alerts and IV lines.

46.     After being removed from the ventilator, NES refused to take a bottle, and therefore had to be fed with a tube through his nose.

47.     Each night, Rachel and Gourab took turns sleeping at the hospital, while the other took care of NGS.

48.     During the time NES was in the PICU, to ease the physical and emotional burden on Rachel and Gourab, MRS went to live with her maternal grandmother, Edie Rotenberg, in Florida.

49.     On March 4, 2015 the Sahoos were informed that a second radiologist had re-read the original CT scan taken of NES on February 24, 2015, which had been interpreted as "negative head CT without contrast," and found there were "bilateral subdural collections."

50.     In fact, NES suffered from a condition in which extra cerebral spinal fluid, which is constantly produced by the body, was not being absorbed quickly enough, so it collected in the subdural space between his brain and his skull.

51.     Based upon the finding of bilateral subdural collections, a complete pediatric skeletal survey was done on NES: x-rays of his skull, spine, chest, abdomen, ribs, arms, hands, fingers, legs, feet and toes.

52.     No acute or healing fractures, no suspicious calcifications indicating healed fractures, and no evidence of any physical injury to NES at any time was found.

53.     The records from NES's pediatrician confirmed that he had never been injured, as did the physical examinations performed at WakeMed, which established there were no neck injuries, healing bruises, scrapes, or other skin marks on NES's body.

54.     An MRI done on March 5, 2015 was interpreted as "probably reflect[ing] *small thin subdural hematomas*," with no evidence of brain swelling, atrophy, or focal loss of brain volume.

55.     The radiologist's diagnosis was that the MRI was "consistent with **chronic** subdural hematomas."

56.     A second radiologist from Wake Radiology then compared the March 5 MRI with the CT scan done on February 24.

57.     Her diagnosis was the same: that what was shown on the CT and the MRI was "consistent with **chronic** subdural hemorrhage, without evidence of mass effect."

58.     These findings by the radiologists employed by WakeMed indicated the subdural hematomas had occurred weeks or months before NES was admitted to WakeMed on February 24, and contained only a minimal amount of blood.

59.     The small amount of blood was not consistent with physical trauma, such as a violent shaking, which would have caused much more bleeding in the subdural space, and would have also likely caused some brain injury.

60.     NES's brain was completely normal.

61.     An ophthalmology examination conducted on March 6, 2015, found 3-4 scattered hemorrhages in one layer of NES's retina, near the back of his eyes.

62.     Such scattered hemorrhages are often caused when an infant is intubated on a ventilator.

63.     On March 6, 2015, as required by North Carolina law, WakeMed informed Wake County Human Services of these findings.

64.     On March 6, 2915 defendant Jamie Gleaton was assigned as the investigator, to determine whether any child abuse had occurred.

65.     Defendant Hayner was Gleaton's supervisor on this investigation.

**Gleaton and Hayner Knew or Reasonably Should Have Known
That NES's Condition, By Itself, Did Not Justify A Conclusion of Child Abuse**

66.     On March 6, 2015, it was well known among child abuse investigators that *chronic subdural hemorrhages with minimal bleeding*, such as was found on the CT and MRI scans of NES, could be caused by birth trauma, metabolic disease, nutritional deficiencies, genetic syndromes, clotting disorders, and infection.

67.     The CT scans of NES did **not** show extensive subdural bleeding, which would have been indicative of abusive head trauma or shaken baby syndrome.

68.     On March 6, 2015, it was also well known among child abuse investigators that *3-4 scattered retinal hemorrhages* could be caused by intubation of an infant on a ventilator.

69.     NES did **not** have extensive retinal hemorrhages in multiple retinal layers extending to the outer portion of the retina, or a detached retina, which would have been indicative of abusive head trauma or shaken baby syndrome.

70.     On March 6, 2015, it was well known among child abuse investigators that

children who had suffered abusive head trauma or shaken baby syndrome often had brain injuries, such as bruising or swelling of the brain.

71.     NES did not have any injury to his brain; his brain was completely normal on his CT and on his MRI.

72.     NES's condition was consistent with natural causes and his recent intubation on a ventilator for his bronchitis.

73.     As a child abuse investigator, Gleaton knew or reasonably should have known this.

74.     As a supervisor of child abuse investigations, Hayner knew or reasonably should have known this.

### Gleaton's "Safety Assessment" Found No Danger of Serious Harm to NES

75.     To determine if a child is at high risk of serious harm, child abuse investigators in North Carolina are required to conduct a "Safety Assessment" and to fill out a "North Carolina Safety Assessment" form, which contains a list of eleven specific factors identified by the State as being "associated with the child being in immediate danger of serious harm."

76.     On March 6, 2015, Gleaton conducted a Safety Assessment, which did not find a single one of these eleven factors.

77.     To the contrary, Gleaton's March 6th Safety Assessment found that the Sahoos were *not* violent, did *not* act toward NES in predominately negative terms, had

*not* caused serious physical harm to NES, and had *not* previously maltreated NES.

78.     On the conclusion of the Safety Assessment form, Gleaton checked the box that stated the children were "conditionally safe;" Gleaton did **not** check the box that stated, "children likely to be in danger of immediate harm.  Remove children from the home."

79.     Upon information and belief, Hayner knew or reasonably should have known of the results of Gleaton's Safety Assessment.

### Hayner Directs and/or Authorizes Gleaton to Take All Three Children into Government Custody and Bar the Sahoos from Any Contact with Them

80.     Upon information and belief, despite Gleaton's conclusion on March 6, 2015, that the children, including NES, were "conditionally safe," defendant Hayner directed and/or authorized Gleaton to order plaintiffs to leave NES's room in the hospital.

81.     Upon information and belief, on March 6, 2015, defendant Hayner directed and/or authorized Gleaton to remove NES from plaintiffs' custody and control and to take NES into government custody and control.

82.      NES remained in the hospital for ten more days.

83.     Upon information and belief, during that 10-day period, defendant Hayner directed and/or authorized Gleaton and other employees of the Wake County Child Protective Services to make all decisions regarding the medical treatment of NES and participated in those decisions.

84.     Upon information and belief, during that 10-day period, defendant Hayner directed and/or authorized Gleaton to bar plaintiffs from having any contact whatsoever with their infant son NES and from making any decisions regarding NES' medical treatment.

85.     Upon information and belief, on March 6, 2015, defendant Hayner directed and/or authorized Gleaton to remove NGS from plaintiffs' custody and to take NGS into government custody.

86.     Upon information and belief, on March 6, 2015, defendant Hayner directed and/or authorized Gleaton to prohibit the plaintiffs from having any contact with NGS "until further notice by CPS," without any evidence that NGS had ever been injured in any way.

87.     Upon information and belief, on March 6, 2015, defendant Hayner directed and/or authorized Gleaton to constructively remove MRS from plaintiffs' custody and to take MRS into the constructive custody of the government.

88.     Upon information and belief, on March 6, 2015, defendant Hayner directed and/or authorized Gleaton to prohibit plaintiffs from having any contact whatsoever with their daughter MRS "until further notice by CPS" without any evidence that MRS had ever been injured in any way.

### Gleaton Takes All Three Children into Government Custody and Bars the Sahoos from Any Contact with Their Children

89.     Despite Gleaton's conclusion, on March 6, 2015, that the children,

including NES, were "conditionally safe," defendant Gleaton ordered plaintiffs to leave NES's room in the hospital.

90.     Upon information and belief, on March 6, 2015, defendant Gleaton removed NES from plaintiffs' custody and control and took NES into government custody and control.

91.     NES remained in the hospital for ten more days.

92.     During that 10-day period, defendant Gleaton and other employees of the Wake County Child Protective Services made all decisions regarding the medical treatment of NES.

93.     During that 10-day period, Gleaton barred plaintiffs from having any contact whatsoever with their infant son NES and from making any decisions regarding NES' medical treatment.

94.     Upon information and belief, on March 6, 2015, defendant Gleaton removed NGS from plaintiffs' custody and took NGS into government custody.

95.     On March 6, 2015, Gleaton prohibited the plaintiffs from having any contact with NGS "until further notice by CPS," without any evidence that NGS had ever been injured in any way.

96.     Upon information and belief, on March 6, 2015, defendant Gleaton constructively removed MRS from plaintiffs' custody and took MRS into the constructive custody of the government

97.     On March 6, 2015, defendant Gleaton prohibited plaintiffs from having any contact whatsoever with their daughter MRS "until further notice by CPS" without any evidence that MRS had ever been injured in any way.

## The Examination of NGS, Disclosed No Indications of Possible Abuse

98.     After taking all three children into the legal custody of the state and barring the Sahoos from having any contact with all three of their children, Hayner and/or Gleaton required that a neighbor, Jessica Perry, immediately bring NGS to WakeMed, where he was hospitalized for an examination.

99.     Upon information and belief, defendants Hayner and/or Gleaton and other employees of the Wake County Child Protective Services made all decisions regarding the medical treatment and examination of NGS, and refused to allow plaintiffs to make any decisions about NGS's medical treatment.

100.    On March 6, 2015, at the direction of defendants Gleaton and/or Hayner, and without the consent of plaintiffs, NGS was examined and given a complete pediatric skeletal survey: x-rays of his skull, spine, chest, abdomen, ribs, arms, hands, fingers, legs, feet and toes.

101.    The aforesaid examination showed that NGS had no acute or healing fractures, no suspicious calcifications indicating healed fractures, and no neck injuries.

102.    The physical examination of NGS disclosed no bruises, scrapes, or other skin marks on NGS's head or body.

103.     Despite the lack of medical findings, Hayner and/or Gleaton ordered an MRI, and NGS was kept at WakeMed overnight.

104.     On March 7, an MRI was performed on NGS.

105.     Although the MRI required NGS to have general anesthesia, Hayner and/or Gleaton prohibited the Sahoos from being present when the anesthesia was administered, or while the MRI was being done.

106.     The results of the MRI were completely normal.

107.     Despite this, Hayner and/or Gleaton required that NGS continue to stay at the hospital.

108.     On March 9, an ophthalmology examination of NGS was conducted.

109.     NGS's ophthalmology exam was completely normal; no retinal bleeding was found.

110.     Hayner and/or Gleaton were informed of the results of NGS's physical examination, skeletal survey, MRI and eye exam, all of which were completely inconsistent with child abuse or shaken baby syndrome.

111.     Despite those results, Hayner and/or Gleaton continued to prohibit the Sahoos from having any contact with NGS.

### Hayner and/or Gleaton Violated the Policies of Wake County CPS

112.     Chapter 7B of the North Carolina General Statutes sets forth the statutory scheme for juvenile proceedings in North Carolina, and Section 7B-100 makes clear that

statutory scheme is to be "interpreted and construed" to "protect the constitutional rights of juveniles *and parents*," and to prevent "the unnecessary or inappropriate separation of juveniles from their parents."

113.    The website of Wake County Child Protective Services sets forth the basic policies and procedures that govern their investigations of suspected child abuse. These policies include the following:

> a.    *When assessing a case of possible child abuse the social worker will seek to interview "persons identified as having information to contribute to the assessment."* Gleaton did not interview anyone other than Rachel and Gourab Sahoo.
>
> b.    *If the social worker determines that "services are needed to assure child safety," the social worker will "work to help the child stay safely at home whenever possible."* Gleaton did not do this.
>
> c.    *If children are "found to be at high risk of serious harm," then "CPS may ask parents to consider placing children temporarily with a relative or trusted caretaker."* Gleaton did not do this.

114.    Upon information and belief, Hayner knew or reasonably should have known that Gleaton did not follow these policies, and condoned this conduct.

115.    As of March 9, 2015, NGS had been thoroughly examined at WakeMed, and was found to have no indications he had ever been abused in any way.

116.    As of March 9, 2015, MRS was living with her grandmother, a retired pre-school teacher, in Florida; neither Hayner nor Gleaton had seen or spoken with MRS or her grandmother.

117.    Nevertheless, on March 9, 2015, Gleaton filed a Juvenile Petition alleging

that NES, NGS and MRS were **all** abused juveniles and further alleging that plaintiffs Rachel and Gourab Sahoo had abused all three children.

118.    The filing of the Juvenile Petition was directed and/or authorized by Hayner.

119.    Upon information and belief, prior to filing the Juvenile Petition, Hayner and/or Gleaton consulted with an attorney or attorneys for the Wake County Child Protective Services, and said attorney or attorneys approved the petition.

120.    Upon information and belief, prior to filing the Juvenile Petition, defendants Hayner and Gleaton did not consult with any pediatrician who was certified in diagnosing child abuse to discuss the findings regarding NES and NGS.

121.    The accusations that plaintiffs Rachel and Gourab Sahoo had abused their children were false, and defendants Hayner and/or Gleaton knew or should have known that said allegations were false.

122.    At all times plaintiffs have provided loving care for all of their children.

123.    The Juvenile Petition, which was sworn to by Gleaton, contained information that Hayner and/or Gleaton knew or reasonably should have known was incomplete, misleading and false.

124.    Hayner and/or Gleaton purposely and/or recklessly omitted or concealed critical exculpatory information from the Juvenile Petition, which omissions made the information provided in the petition even more misleading.

125.    Upon information and belief, on March 9, 2015, Hayner directed and/or

18

authorized Gleaton to seek an order authorizing the Wake County Human Services to retain custody of all three children.

126.    Hayner and Gleaton did not provide the Sahoos with notice of their intent to seek the order or with an opportunity to be heard in opposition to the request for the order.

127.    As a result of Gleaton's false, incomplete and misleading information, which was directed and/or authorized by defendant Hayner, the court issued an *ex parte* order on March 9, 2015 allowing Wake County Human Services ("WCHS") to keep custody of NES and NGS, but not MRS.

128.    The order issued on March 9, 2015 did not require defendants Hayner and Gleaton to prohibit plaintiffs from visiting with or speaking to any of their children, even under supervision.

129.    On March 6, 2015, defendants Hayner and Gleaton had decided to relinquish custody of NGS to Jessica Perry, the Sahoos' close friend and neighbor, whose husband was a police officer in Cary, North Carolina, when NGS was released from the hospital.

130.    On March 9, 2015, defendants Hayner and Gleaton and other employees of WCHS kept NGS in government custody and placed NGS into a foster home, rather than releasing NGS to Jessica Perry.

131.    Hayner and Gleaton did not inform the Sahoos that  they had placed NGS

with a foster family.

132.    Sometime between March 9 and March 12, 2015, the exact date being unknown to plaintiffs, Hayner and/or Gleaton allowed the foster parents with whom NGS had been placed to visit with and feed NES at the hospital.

133.    Hayner and Gleaton did not inform the Sahoos that they had allowed these individuals to visit with and feed their son NES, while prohibiting plaintiffs from visiting NES, even with the supervision of a nurse.

134.    On March 12, 2015, a non-secure custody hearing was held in Wake County District Court.

135.    Upon information and belief, defendants Hayner and Gleaton were present and represented by counsel at said hearing.

136.    During this hearing, Gleaton repeated the false and misleading allegations contained in her Petition.

137.    On March 16, 2015, as a result of Gleaton's false, incomplete and misleading statements, the court entered an order for non-secure custody, thereby allowing WCHS to continue to exercise custody and control of NES and NGS; the order did **not** grant WCHS custody and control over MRS.

138.    The order did not require plaintiffs to vacate their own home.

**Gleaton and Hayner Refused to Allow the Sahoos to Live with NES, NGS and Edie Rotenberg**

139.    On or about March 16, 2015, defendants Hayner and Gleaton agreed to

allow NES and NGS to reside with Rachel Sahoo's mother, Edie Rotenberg, at the Sahoos' house in Wake County, along with MRS.

140.  Defendants Hayner and Gleaton, however, refused to permit plaintiffs to reside in their own house, even under the supervision of Edie Rotenberg, and required the Sahoos to rent a separate apartment at which to live.

### Between March 20, 2015 and May 22, 2015, Kitty Hart and Sweetly Sanders Severely Limited the Sahoos' Visits With Their Children

141.  The March 16 order allowed the Sahoos a **"minimum"** of one hour of visitation per week with NES, and a **"minimum"** of two hours of visitation per week with NGS, to be conducted under WCHS supervision.

142.  The March 16 order did not restrict the Sahoos' contact with MRS in any way, because MRS was not in government custody.

143.  The order did not impose any other restrictions on plaintiffs' contact with their children.

144.  The WCHS foster care social worker initially assigned to the case, whose name is currently unknown, told the Sahoos that, after she personally supervised a few visits, she would delegate responsibility for supervising visits to Edie Rotenberg.

145.  On or about March 20, 2015, defendant Kitty Hart was assigned to the Sahoos' case as the foster care social worker.

146.  Defendants Hart and Sanders knew or reasonably should have known of the contents of the March 16, 2015 order.

147.    Defendants Sanders and/or Hart immediately revoked the decision of the prior social worker and informed the Sahoos that they would have to visit NES and NGS in a facility approved by WCHS, and under the personal supervision of WCHS employees.

148.    At first, defendants Sanders and Hart allowed the Sahoos to visit their children only once a week, at the WCHS offices.

149.    In violation of the court order, defendants Sanders and/or Hart refused to permit MRS to reside with the Sahoos.

150.    In violation of the court order, defendants Sanders and/or Hart refused to permit the Sahoos to visit with MRS except under the supervision of WCHS.

151.    In violation and/or in excess of the court order, defendants Sanders and/or Hart refused to permit the Sahoos to visit their children at any location other than the WCHS offices.

152.    The visits at WCHS generally fit the following pattern:

The Sahoos were not allowed in the waiting area until defendant Hart was there. Mrs. Rotenberg had to bring the children into the WCHS offices alone. Once Hart was there, the Sahoos, their children and Mrs. Rotenberg would all be brought into a small room that had a sofa and a table with some chairs. During the entire visit, Hart would sit with her laptop, watching the Sahoos interact with their children and writing notes about said observations. The Sahoos would bring crafts, coloring books, and activities for MRS, and baby toys for the boys. The Sahoos would spend the two hours taking turns holding the boys and playing with MRS, all under the surveillance of Hart, who critiqued the way the Sahoos interacted with their children. Hart prohibited the Sahoos from taking MRS to the toilet, even under supervision. If defendant Hart had to leave the room, she would have someone else come in. At the end of each visit, the Sahoos had to time their exit from the room so as to avoid any contact with Mrs. Rotenberg and the children while walking

to their respective cars. At all times, Hart was judging the Sahoos as parents.

153. No court order required any of the aforementioned conditions on plaintiffs' contact with their children.

154. After several weeks, Hart arranged a second weekly visit at a facility called "Safe Spaces," which was located across the street from the Woman's Prison in Raleigh.

155. No court order required that visits take place only at said location.

156. The visits at Safe Spaces generally lasted for two hours and fit the following pattern, none of which was required by the court order:

> The Sahoos had to arrive 15 minutes early, to avoid any contact with their children entering Safe Spaces. Mrs. Rotenberg had to wait in a hallway with the three children until the visit actually started. The visits were supervised by two social workers at a time. During the visits one of the social workers would at times dictate when and how the Sahoos should interact with their children, and was especially critical about MRS, claiming that she was spoiled. The social worker would at times also yell at MRS, and would tell Rachel Sahoo to put MRS in "time out" when MRS began to cry. After the visits, the Sahoos were required to stay to listen to a critique, by the social worker, of their parenting abilities.

### Between March 20, 2015 and May 22, 2015, Sweetly Sanders and Kitty Hart Maintained Custody and Control Over MRS

157. Although Gleaton's March 9, 2015 Juvenile Petition had sought a court order granting custody of MRS to WCHS, the District Court's order did **not** give WCHS custody of MRS.

158. Despite the lack of a court order, and despite the fact there was no evidence that MRS had ever been injured by the Sahoos in any way, from about March 20, 2015

until about May 22, 2015, defendants Sanders and Hart exercised control over the Sahoos' contact and relationship with MRS.

159.    Sanders and/or Hart prohibited the Sahoos from having any contact with MRS that Sanders and/or Hart did not specifically approve.

160.    As a result of Sanders' and/or Hart's conduct, MRS was prohibited from living with the Sahoos in their apartment.

161.    As a result of Sanders' and/or Hart's conduct, the Sahoos were only permitted to see MRS twice a week, for a maximum of four hours.

162.    During these short visits, the Sahoos' interactions with MRS were not only observed, but also critiqued by Hart and Hart's colleagues.

163.    As a result of Sanders' and/or Hart's conduct, Rachel Sahoo was prohibited from volunteering at MRS's preschool, as she had previously done.

164.    As a result of Sanders' and/or Hart's conduct, Rachel Sahoo was not permitted to be with MRS on Mother's Day 2015.

165.    As a result of Sanders' and/or Hart's conduct, and in violation or in excess of the court order, Rachel Sahoo was required to seek special permission to attend a public dance recital involving MRS, and had to be supervised by a person approved by WCHS.

166.    As a result of Sanders' and/or Hart's conduct, and in violation or in excess of the court order, Rachel Sahoo was denied permission to attend a previously scheduled dental appointment for MRS, despite the fact that Mrs. Rotenberg would also be there.

167.    As a result of Sanders' and/or Hart's conduct, Rachel and Gourab Sahoo had to negotiate with Sanders and/or Hart regarding when and by whom MRS's regular doctor's appointments would be conducted, and whether they could attend those doctor appointments.

168.    As a result of Sanders' and/or Hart's conduct, every aspect of the Sahoos' relationship with their daughter had to be approved in advance by Sanders and/or Hart.

169.    As a result of Sanders' and/or Hart's conduct, the Sahoos were deprived of their right to control the life of their daughter from on or about March 20, 2015 until on or about May 22, 2015.

170.    As a result of Sanders' and/or Hart's conduct, MRS has suffered from "separation anxiety" when she is not with Rachel or Gourab Sahoo.

### Between March 20, 2015 and May 22, 2015, Sanders and/or Hart Refused to Modify the Custody or Visitation Arrangements

171.    On or about March 24, 2015, Sanders and/or Hart were informed that Gourab and Rachel Sahoo had each passed polygraph examinations in which they denied shaking or causing any physical injury to NES.

172.    SBI polygrapher Lacy Pittman found Gourab to be truthful in denying that he had ever shaken NES, caused physical injury to NES, or physically hurt NES.

173.    Former North Carolina State Highway Patrol polygrapher Michael Lane found Rachel to be truthful in denying that she had ever shaken, dropped or struck NES,

and in her statements to Child Protective Services.

174.    Also on or about March 24, Sanders and/or Hart received affidavits from seven people who were familiar with the Sahoos and how they treated their children.

175.    The affiants included a Town of Cary Police Officer who was their next-door neighbor, two special education teachers, one elementary school teacher and a registered nurse.

176.    All seven had seen the Sahoos interact with their children on multiple occasions in various situations every week, and all agreed that the Sahoos were gentle, loving, patient parents, who never appeared frustrated or agitated by their children, and never complained about their children in any way.

177.    The Sahoos' relationship was described in the affidavits as loving; none of the affiants had observed any signs of financial or marital stress.

178.    The affiants described the children, including the infant twins, as "easy-going" and "happy" babies.

179.    Upon information and belief, Sanders and/or Hart received no reports from any witness who contradicted the information in the affidavits.

180.    On or about April 19, 2015 Rachel and Gourab Sahoo each underwent a psychological assessment at Princeton House Behavioral Health, as required by WCHS.

181.    The psychological assessment of Rachel Sahoo found that she had "no history of mania, hypomania or psychosis," "no history of recreational drug use," and was

"goal directed, rational and trustworthy."

182. The assessment concluded "Rachel carries all the traits of a dedicated, reliable, caring and loving mom. . . . It is strongly recommended that Rachel should unite with her biological children as soon as possible."

183. The psychological assessment of Gourab Sahoo found that he had no history of psychosis or drug use, and that his insight, coping skills and judgment were all normal.

184. The assessment concluded that Gourab "has strong traits of a dedicated, loving and caring father."

185. Despite receiving the information set forth above, despite the fact there was no evidence that NGS or MRS had ever been injured in any way, and despite the fact that Rachel's mother, Mrs. Rotenberg, was living at the house and had agreed to supervise the Sahoos' interactions with their children, Sanders and/or Hart continued to prohibit the Sahoos from living in the house with their children.

186. Sanders and/or Hart also refused to approve Mrs. Rotenberg as a person who could supervise the Sahoo's visits with their children.

187. Sanders and/or Hart refused to allow the Sahoos to visit with their children in their home, even with supervision by a third party approved by WCHS.

188. Sanders and/or Hart refused to increase the amount of visitation the Sahoos could have with their children each week.

189. Sanders and/or Hart continued to insist that the Sahoos have no contact with

their children, even in public spaces or at doctor's visits, except under WCHS supervision.

190.    Sanders and/or Hart refused to vary the visitation schedule to accommodate Gourab's work, which caused him to miss time visiting with his children.

191.    None of these actions by Sanders and Hart were required by the court order.

### Defendants Sanders and Hart Refused to Allow Gourab Sahoo's Parents to Stay in the House With Their Grandchildren

192.    Beginning on or about March 16, 2015, the Sahoos sought permission from WCHS to allow Gourab Sahoo's parents, Jugal and Sabita Sahoo, to visit their grandchildren and to assist Mrs. Rotenberg in caring for them.

193.    On April 6, 2015, as requested by Hart, criminal background checks for Jugal and Sabita Sahoo were provided to WCHS, showing that neither had any criminal record.

194.    On April 9, 2015, Jugal and Sabita Sahoo came to the United States from their home in India.

195.    Sanders and/or Hart refused to allow Jugal and Sabita Sahoo to stay with Mrs. Rotenberg at the Sahoo's house to assist her in caring for NES, NGS and MRS.

196.    Sanders and/or Hart refused to allow Jugal and Sabita Sahoo to visit their grandchildren at the Sahoo's house, even if Mrs. Rotenberg was present to supervise.

197.    Sanders and/or Hart refused to allow Jugal and Sabita Sahoo to visit their grandchildren without supervision directly by WCHS.

198.    The reason given by Hart for her refusal was that Jugal and Sabita Sahoo

did not speak English and were from a different culture.

199.    In fact, Jugal, a retired banker, spoke English, and Sabita could understand basic English.

200.    Between April 9, 2015, when they arrived in the United States, and May 22, 2015, when WCHS finally dismissed the Petition, Sanders and/or Hart only permitted Gourab's parents to visit with their grandchildren twice, for a total of two hours, at the WCHS offices under WCHS supervision.

201.    None of these actions by Sanders and Hart were required by the court order.

202.    Sanders' and Hart's actions caused great emotional distress to Rachel and Gourab Sahoo.

## The Independent Child Medical Examination Found No Abuse

203.    In May 2015, Wake County Human Services finally arranged for NES to be evaluated by independent pediatricians at Duke Medical Center who were specifically trained and certified to conduct Child Medical Examinations (CMEs) and to determine whether child abuse had occurred.

204.    Upon information and belief, no CME had been performed on NES during the months that WCHS exercised custody and control over the Sahoo's children.

205.    The pediatricians at Duke Medical Center, after reviewing the WakeMed records, test results and scans, consulting with the doctors at WakeMed who had examined NES, and conducting their own complete Child Medical Examination (CME), found that

the medical evidence did not support the conclusion that NES had been physically abused.

206.     NES's symptoms were instead found to be consistent with natural causes and with the fact he had been intubated on a breathing machine for his bronchitis for almost a week.

207.     Several other physicians with substantial expertise in child abuse examinations agreed with these findings.

208.     On May 22, 2015, the Juvenile Petition was finally dismissed, and the children were returned to the Sahoos' custody and care.

## CAUSES OF ACTION

## FEDERAL CLAIMS

### COUNT I
### 42 U.S.C. § 1983

**DEPRIVATION OF FUNDAMENTAL PARENTAL RIGHTS
AND DENIAL OF SUBSTANTIVE DUE PROCESS
IN VIOLATION OF THE FOURTEENTH AMENDMENT**

(March 6, 2015 - March 9, 2015)

(Against Jamie Gleaton in her Individual Capacity,

Richard Hayner in his Individual and Supervisory Capacities, and

John Doe Supervisors and Officials, in their Supervisory and Official Capacities,
relating to NES, NGS and MRS)

209.     Plaintiffs incorporate all of the foregoing paragraphs as if set forth herein and further allege as follows:

210.     Parents have a fundamental liberty interest in the integrity and privacy of their family, and in the care, custody and control of their children.

211.     Children have a reciprocal fundamental liberty interest in being cared for by their parents.

212.     The state's removal of a child from his parent's care, custody and control constitutes an interference with a liberty interest of the parents and the children, and thus triggers the substantive protections of the Fourteenth Amendment.

213.     Parents and children also have a right to intimate association with each other, protected by the First Amendment.

214.     Between March 6, 2015 and March 9, 2015, defendants Gleaton and Hayner deprived the Sahoos of their fundamental liberty interest in the care, custody and control of their children NES, NGS, and MRS, and thereby deprived Rachel and Gourab Sahoo of their constitutionally protected right to family integrity and privacy.

215.     Between March 6, 2015 and March 9, 2015, defendants Gleaton and Hayner deprived NES, NGS, and MRS of their fundamental liberty interest in being cared for by their parents.

216.     Between March 6, 2015, and March 9, 2015, defendants Gleaton and Hayner deprived all plaintiffs of their fundamental right to intimate association, protected by the First Amendment.

217.     Between March 6, 2015 and March 9, 2015, defendants Gleaton and Hayner

engaged in the following acts, among others yet to be discovered, which were arbitrary, capricious, oppressive, abusive, and conscious-shocking:

a. Ordering the Sahoos to immediately leave the hospital room where their five-month old prematurely born son NES was still on a feeding tube and numerous monitors and lines, trying to recover from metapneumovirus and severe respiratory distress.

b. Barring the Sahoos from visiting NES, even if a nurse was present, while he remained in the hospital trying to recover from metapneumovirus and severe respiratory distress.

c. Barring the Sahoos from being present, even with a nurse, when their five-month old prematurely born son NGS was subjected to an MRI procedure that required general anesthesia.

d. Barring the Sahoos from having **any** contact with NGS or their three year old daughter, MRS, under any circumstances "until further notice by CPS," despite concluding in a safety assessment that they were not in any danger of immediate harm.

e. Such other arbitrary and capricious acts as may be disclosed during discovery and/or proven at trial.

218. Upon information and belief, defendant Hayner, and one or more of the John Doe supervisors and officials, supervised, directed, approved, condoned, ratified and/or otherwise participated in the arbitrary and capricious acts engaged in by defendant Gleaton.

219. Defendants Hayner's and Gleaton's arbitrary, capricious and conscience-shocking acts directly and proximately caused Rachel and Gourab Sahoo to be deprived of the fundamental parental right to the custody, control and care of NES and NGS.

220. As a direct and foreseeable consequence of defendants Hayner's and Gleaton's arbitrary, capricious and conscience-shocking acts between March 6, 2015 and

March 9, 2015, Rachel and Gourab Sahoo have suffered injuries and damages, including but not limited to mental suffering, severe mental anguish, emotional distress, humiliation, indignities and embarrassment, degradation, restrictions on all facets of their parental rights, loss of income, legal fees and other monetary damages, as well as other damages to be determined at the trial of this matter.

**COUNT II**
**<u>42 U.S.C. § 1983</u>**

**DEPRIVATION OF FUNDAMENTAL FAMILY RIGHTS**
**AND DENIAL OF PROCEDURAL DUE PROCESS**
**IN VIOLATION OF THE FOURTEENTH AMENDMENT**

(March 6, 2015 - March 9, 2015)

(Against Jamie Gleaton in her Individual Capacity,

Richard Hayner in his Individual and Supervisory Capacities, and
John Doe Supervisors and Officials, in their Supervisory and Official Capacities,
relating to NES, NGS and MRS)

221.     Plaintiffs incorporate all of the foregoing paragraphs as if set forth herein and further allege as follows:

222.     Parents have a fundamental liberty interest in the integrity and privacy of their family, and in the care, custody and control of their children.

223.     Children have a fundamental liberty interest in the integrity and privacy of their family, and in being cared for by their parents.

224.     When the government seeks to interfere with the aforementioned liberty

interests, the Fourteenth Amendment requires the government to provide both the parents and the children with procedural due process of law, in the form of a pre-deprivation hearing, *i.e.*, notice and an opportunity to be heard prior to the removal of the children from the parents' custody.

225.     The pre-deprivation hearing requirement may be dispensed with only if the children are immediately threatened with harm and the threat is so imminent that the government lacks sufficient time to provide a pre-deprivation hearing.

226.     On March 6, 2015, defendants Gleaton and Hayner deprived the Sahoos of their right to procedural due process of law by removing NES and NGS from the Sahoos custody and control without a pre-deprivation hearing.

227.     On March 6, 2015, neither NES nor NGS was immediately threatened with harm.

228.     On March 6, 2015, defendants Gleaton and Hayner had no information that NGS had been harmed or that he was immediately threatened with harm.  The lack of harm to NGS was confirmed by medical tests on March 6, 2015.

229.     Despite this, defendants Gleaton and Hayner ordered that the plaintiffs have absolutely no contact with NGS "until further notice by CPS."

230.     Gleaton and Hayner further ordered that NGS be held overnight at the hospital, and that he be subjected to an MRI with general anesthesia, without his parents' permission.  They then continued to keep NGS at the hospital before placing him with a

foster family.

231.     On March 6, 2015, NES was not immediately threatened with harm.  On the contrary, NES was staying safely in the hospital, under constant supervision of medical personnel.

232.     Defendants Gleaton and Hayner had no reason to believe that the Sahoos would attempt to remove NES from the hospital or subject him to any type of harm while he was in the hospital.

233.     Despite this, defendants Gleaton and Hayner ordered the Sahoos to immediately leave NES's hospital room and prohibited them from having any contact whatsoever with NES "until further notice by CPS."

234.     On March 6, 2015, defendants Gleaton and Hayner had ample time to provide plaintiffs with notice and an opportunity to be heard prior to removing NES and NGS from plaintiffs' custody and control.

235.     In removing NES and NRS from plaintiffs' custody and control without a pre-deprivation hearing, defendants Gleaton and Hayner violated the constitutional rights of the Sahoos, NES, and NGS to procedural due process of law.

236.     On March 6, 2015, defendants Gleaton and Hayner also deprived the Sahoos of the custody and control of their daughter, MRS, without a pre-deprivation hearing, by prohibiting plaintiffs from having any contact whatsoever with MRS, "until further notice by CPS."

237.     On March 6, 2015, defendants Gleaton and Hayner deprived MRS of her parents by prohibiting MRS, without a pre-deprivation hearing, from having any contact whatsoever with her parents "until further notice by CPS."

238.     Defendants Gleaton's and Hayner's conduct between March 6, 2015 and March 9, 2015 violated the procedural due process rights of the plaintiffs and their children by denying them a pre-deprivation hearing, and directly and proximately caused Rachel and Gourab Sahoo to be deprived of the fundamental parental right to the custody, control and care of NES, NGS and MRS without having the opportunity to be heard by a court.

239.     Defendant Hayner, and one or more of the John Doe supervisors and officials, supervised, directed, approved, condoned, ratified and/or otherwise participated in the conduct engaged in by defendant Gleaton between March 6, 2015 and March 9, 2015.

240.     As a direct and foreseeable consequence of defendants Hayner's and Gleaton's conduct between March 6, 2015 and March 9, 2015, Rachel and Gourab Sahoo have suffered injuries and damages, including but not limited to mental suffering, severe mental anguish, emotional distress, humiliation, indignities and embarrassment, degradation, restrictions on all facets of their parental rights, loss of income, legal fees and other monetary damages, as well as other damages to be determined at the trial of this matter.

# COUNT III
## 42 U.S.C. § 1983

**DEPRIVATION OF FUNDAMENTAL PARENTAL RIGHTS
AND DENIAL OF SUBSTANTIVE DUE PROCESS
IN VIOLATION OF THE FOURTEENTH AMENDMENT**

(March 20, 2015 - May 22, 2015)

(Against Kitty Hart in her Individual Capacity,

Sweetly Sanders in her Individual and Supervisory Capacities, and
John Doe Supervisors and Officials, in their Supervisory and Official Capacities,
Relating to MRS)

241.   Plaintiffs incorporate all of the foregoing paragraphs as if set

forth herein and further allege as follows

242.   Between March 20, 2015 and May 22, 2015, defendants Hart  and Sanders

deprived the Sahoos of their fundamental liberty interest in the care, custody and control

of their three- year old daughter, MRS, and thereby deprived Rachel and Gourab Sahoo of

their constitutionally protected right to family integrity and privacy.

243.   Between March 20, 2015 and May 22, 2015, defendants Hart and Sanders

engaged in the following acts, among others yet to be discovered, which were arbitrary,

capricious, oppressive, abusive, and conscious-shocking:

   a.   Asserting and/or exercising custody and control over MRS despite the
fact that the Wake County District Court had not granted WCHS custody of MRS
in its March 16, 2015 order.

   b.   Prohibiting the Sahoos from living with MRS, despite the absence of
any evidence that either had ever injured her in any way, and contrary to a court
order.

c. Prohibiting the Sahoos from spending any time with MRS unless supervised by Hart or her designee.

d. Prohibiting Rachel Sahoo from volunteering at MRS's pre-school.

e. Preventing Rachel Sahoo from seeing MRS on Mother's Day, 2015.

f. Requiring that a person approved by Hart "supervise" Rachel Sahoo in order for her to attend a public dance recital involving MRS.

g. Preventing Rachel Sahoo from attending a dentist appointment with MRS, despite the presence of Edie Rotenberg.

h. Such other arbitrary and capricious acts as may be disclosed during discovery and/or proven at trial.

244. Defendant Sanders, and one or more of the John Doe supervisors and officials, supervised, directed, approved, condoned, ratified and/or otherwise participated in the arbitrary and capricious acts engaged in by defendant Hart between March 20, 2015 and May 22, 2015.

245. Defendants Sanders' and Hart's arbitrary, capricious and conscience-shocking acts directly and proximately caused Rachel and Gourab Sahoo to be deprived of the fundamental parental right to the custody, control and care of MRS, NES and NGS.

246. As a direct and foreseeable consequence of defendants Sanders' and Hart's arbitrary, capricious and conscience-shocking acts between March 20, 2015 and May 22, 2015, Rachel and Gourab Sahoo have suffered injuries and damages, including but not limited to mental suffering, severe mental anguish, emotional distress, humiliation, indignities and embarrassment, degradation, restrictions on all facets of their parental

rights, loss of income, legal fees and other monetary damages, as well as other damages to

be determined at the trial of this matter.

**COUNT IV**
**<u>42 U.S.C. § 1983</u>**

**DEPRIVATION OF FUNDAMENTAL PARENTAL RIGHTS**
**AND DENIAL OF PROCEDURAL DUE PROCESS**
**IN VIOLATION OF THE FOURTEENTH AMENDMENT**

(March 20, 2015 - May 22, 2015)

(Against Kitty Hart in her Individual Capacity
Sweetly Sanders in her Individual and Supervisory Capacities, and
John Doe Supervisors and Officials, in their Supervisory and Official Capacities,
Relating to MRS)

247.     Plaintiffs incorporate all of the foregoing paragraphs as if set forth herein

and further allege as follows:

248.     From March 20, 2015, to May 22, 2015, defendants Hart and Sanders

deprived the Sahoos of the custody and control of their daughter, and deprived MRS of

the comfort and nurturing of her parents, despite the fact that the Wake County District

Court had not granted WCHS custody of MRS at the hearings held on March 9, 2015 and

March 12, 2015.

249.     At no time was MRS immediately threatened with harm.  On the contrary,

MRS was healthy, happy, and well cared for, with no reported injuries at any time.

250.     Between March 20, 2015 and May 22, 2015, defendants Hart and Sanders

violated the procedural due process rights of the plaintiffs and MRS by exercising

custody and control over MRS in the absence of any court order granting WCHS custody and control of MRS, and thereby directly and proximately caused Rachel and Gourab Sahoo to be deprived of their fundamental parental right to the custody, control and care of MRS.

251.    Defendant Sanders, and one or more of the John Doe supervisors and officials, supervised, directed, approved, condoned, ratified and/or otherwise participated in the conduct engaged in by defendant Hart between March 20, 2015 and May 22, 2015.

252.    As a direct and foreseeable consequence of defendants Sanders' and Hart's conduct between March 20, 2015 and May 22, 2015, Rachel and Gourab Sahoo have suffered injuries and damages, including but not limited to mental suffering, severe mental anguish, emotional distress, humiliation, indignities and embarrassment, degradation, restrictions on all facets of their parental rights, loss of income, legal fees and other monetary damages, as well as other damages to be determined at the trial of this matter.

## COUNT V
## 42 U.S.C. §1983

### *MONELL* CLAIM FOR UNCONSTITUTIONAL CUSTOMS AND PRACTICES AND FAILURE TO TRAIN, SUPERVISE AND DISCIPLINE

### (Against Wake County)

253.    Plaintiff hereby incorporates all of the foregoing paragraphs and further alleges as follows:

254. The Wake County Department of Human Services was at all times relevant to this Complaint an entity controlled and funded by Wake County.

255. Upon information and belief, the Director of the Wake County Department of Human Services ("the Director") was at all times relevant to this Complaint selected by officials of Wake County.

256. Wake County officials appointed Regina Petteway as the Interim Director of the Department of Human Services on August 27, 2014. County officials appointed her as the permanent Director on March 12, 2015.

257. Upon information and belief, Wake County delegated the rules, procedures and training that applied to persons employed by the Wake County Department of Human Services to the Director.

258. The Director, and/or her designee, had the power and responsibility to train and supervise employees in the Child Protective Services and Foster Care Program.

259. The Director, and/or her designee, during the relevant time period was the final policymaker for Wake County with regard to all activities conducted within the County by employees of the Child Protective Services and Foster Care Program.

260. The acts and omissions of the Director, and/or her designee, during that time constituted the policy, custom, or pattern and practice of the Wake County.

261. Before and during the events outlined previously in this Complaint, Wake County, by and through its final policymaker(s), with deliberate indifference, (a) engaged

in a pattern and/or practice of violating the written policies adopted by the North Carolina Department of Health and Human Services, Division of Social Services ("NCDSS"), as set forth in the NCDSS Family Services Manual ("Family Services Manual") (b) maintained a policy, custom, or pattern and practice of removing **all** children from the custody and control of parents based upon an unconfirmed suspicion of the abuse of one child despite evidence that the other children had never been abused, and without due process of law; (c) failed to adequately train and supervise social workers and other employees of the Child Protective Services and Foster Care Program in connection with conducting investigations of allegations of child abuse and interacting with parents during such investigations; and (d) maintained other patterns and practices that violated the Family Services Manual, to be identified during discovery and proved at trial.

262. Upon information and belief, the customs and/or practices of employees of the Child Protective Services and Foster Care Program violated the written policies set forth in the Family Services Manual.

263. Upon information and belief, at all times relevant to this complaint, Richard Hayner and Sweetly Sanders, along with Jamie Gleaton and Kitty Hart, acted in accordance with the policy, custom, and/or pattern and practice of the Child Protective Services and Foster Care Program, and in violation of the written policies set forth in the Family Services Manual.

264. Upon information and belief, the Director and/or her designee knew of and condoned, approved and ratified the conduct of Richard Hayner, Sweetly Sanders, Jamie Gleaton and Kitty Hart.

265. Upon information and belief, the Child Protective Services and Foster Care Program adhered to this policy and/or practice of removing all children from the custody and control of parents suspected of abusing one child, without due process of law, even in cases where the evidence established that the other children removed had never been physically abused.

266. Acting pursuant to this policy and/or practice, defendants Wake County, Hayner, Sanders and one or more of the John Does authorized the removal of all the plaintiffs' three children from the custody and control of the plaintiffs, despite evidence that NGS and MRS have never been abused, and interfered with the relationship between plaintiffs and all of their children, in violation of plaintiffs' substantive and procedural due process rights, as set forth in Counts I - IV of this Complaint.

267. This policy and/or practice also constituted an unlawful interference with plaintiffs' liberty interests in the care and custody of their children, and their right of intimate association with their family, in violation of the First and Fourteenth Amendments to the United States Constitution.

268. Upon information and belief, in 2015 the Child Protective Services and Foster Care Program had a policy and/or practice of failing to timely obtain independent

medical examinations in cases of purported abuse.

269. The policies and/or practices of the Child Protective Services and Foster Care Program, and their implementation, were gross deviations from acceptable professional conduct.

270. It would have been plainly obvious to a reasonable policymaker that (a) violating the written policies set forth in the Family Services Manual; (b) maintaining a policy, custom, or pattern and practice of removing all children from the custody and control of their parents despite the fact that there was evidence that some of the children had never been abused, and without due process of law; and (c) failing to adequately train and supervise social workers and other employees in connection with conducting investigations of allegations of child abuse and interacting with parents during such investigations, would lead to the deprivation of parents' constitutional rights.

271. The Director and/or her designee knew or reasonably should have known that employees of the Child Protective Services and Foster Care Program were engaging in a pattern and/or practice of violating the written policies set forth in the Family Services Manual, as outlined above, and condoned, approved of and/or ratified such conduct.

272. The Director and/or her designee knew or reasonably should have known that employees of the Child Protective Services and Foster Care Program of the Wake County Department of Human Services, including but not limited to defendants Hayner and Sweetly, as well as Jamie Gleaton and Kitty Hart, had not been adequately or properly

trained with regard to conducting investigations of allegations of child abuse and interacting with parents during such investigations.

273. The Director and/or her designee knew or reasonably should have known that employees of the Child Protective Services and Foster Care Program of the Wake County Department of Human Services, including but not limited to defendants Hayner and Sweetly, as well as Jamie Gleaton and Kitty Hart, were engaging in a pattern and/or practice of maintaining custody and control of children who had not been abused and/or who had not been committed by a judge to the custody of the Department of Human Services

274. The Director and/or her designee, knew or reasonably should have known that employees of the Child Protective Services and Foster Care Program, including but not limited to defendants Hayner and Sweetly, as well as Jamie Gleaton and Kitty Hart, were systematically disregarding proper and accepted practices and procedures with regard to the investigation of allegations of child sexual abuse and with regard to the removal of children from the custody and control of their parents.

275. Upon information and belief, the Director and/or her designee agreed to, approved, condoned, and/or ratified the policies and/or practices of the Child Protective Services and Foster Care Program that violated the written policies set forth in the Family Services Manual.

276. The Director and/or her designee, created, promulgated and maintained, with

deliberate indifference, a policy, custom, and/or pattern and practices which deprived the plaintiffs of their constitutional right not to be deprived of the custody and control of their children without due process.

277.     The policies and customs agreed to, approved, condoned, and/or ratified by the Director and/or her designee, caused the improper and unconstitutional conduct engaged in by defendants Hayner and Sanders, as well as by Jamie Gleaton and Kitty Hart, in connection with the investigation of the plaintiffs.

278.     The wrongful acts and omissions that caused the violation of the plaintiffs' constitutional rights were carried out pursuant to the municipal defendant's policies, customs, patterns or practices.

279.     The municipal policies, customs or patterns and practices of Wake County proximately and directly caused the violation of the plaintiffs' constitutional right to the custody and control of their children.

280.     Defendant Wake County is liable for the deprivation of the plaintiffs' constitutional rights caused by the policies, practices and customs agreed to, approved, condoned, and/or ratified by the Director of the Department of Human Services and/or her designee.

281.     As a direct and proximate result of the above described wrongful conduct of defendant Wake County, the plaintiffs suffered significant damages, to be determined at the trial of this matter

## STATE COMMON LAW CLAIMS

## COUNT VI

## NEGLIGENCE/GROSS NEGLIGENCE/RECKLESSNESS

(March 6-9, 2015)

(Against Jamie Gleaton in her Individual Capacity,

Richard Hayner in his Individual and Supervisory Capacities, and
John Doe Supervisors and Officials, in their Supervisory Capacities,
relating to NES, NGS and MRS)

282.     Plaintiffs incorporate all of the foregoing paragraphs as if set forth herein
and further allege as follows:

283.     Defendants Hayner's and Gleaton's conduct between March 6 and March
9, 2015 was reckless and malicious, and public officer immunity therefore does not apply
to her conduct.

284.     At the time of the events that occurred from March 6 through March 9 of
2015, defendants Hayner and Gleaton owed Rachel and Gourab Sahoo a duty of due care
with respect to the investigation of their conduct relating to the custody and control of their
children.

285.     The duty of due care owed to Rachel and Gourab Sahoo included, but was
not limited to, the following duties:

   a.     To ensure that parents were not wrongfully deprived of the custody and
          control of their children;

   b.     To ensure that any investigation of parents for suspected child abuse was

conducted in accordance with the statutory requirements and the policies of the Wake County Department of Human Services, and in a fair and neutral manner;

c.    To ensure that the investigators were fully aware of the significance, or the lack of significance, of any and all medical findings;

d.    To consider all the evidence, including the evidence that tended to show that a child had not been abused by his parents, and to conduct CPS investigations professionally and with the goal of finding the truth;

e.    To not present false and/or misleading information to the District Court, and to not withhold or conceal material facts from the District Court; and

f.    To follow proper CPS procedures and the United States Constitution in conducting all investigations of suspected child abuse.

286.    Defendants Hayner's and Gleaton's conduct as public employees from March 6-March 9, 2015 was negligent, grossly negligent and/or reckless, and breached their duty of due care to Rachel and Gourab Sahoo.

287.    Defendants Hayner and Gleaton acted with malice as a matter of law, and with reckless disregard for the rights of Rachel and Gourab Sahoo.

288.    As a direct and foreseeable consequence of defendants Hayner's and Gleaton's negligence, gross negligence and recklessness between March 6, 2015 and March 9, 2015, Rachel and Gourab Sahoo have suffered injuries and damages, including but not limited to the following: mental suffering, severe mental anguish, emotional distress, humiliation, indignities and embarrassment, degradation, restrictions on all facets of their parental rights, loss of income, legal fees and other monetary damages, as well as other damages to be determined at the trial of this matter.

# COUNT VII
## NEGLIGENCE/GROSS NEGLIGENCE/RECKLESSNESS

(March 20 - May 22, 2015)

(Against Kitty Hart in her Individual Capacity
Sweetly Sanders in her Individual and Supervisory Capacities, and
John Doe Supervisors and Officials, in their Supervisory Capacities
relating to MRS)

289.    Plaintiffs incorporate all of the foregoing paragraphs as if set forth herein and further allege as follows:

290.    Defendants Sanders' and Hart's conduct between March 20 and May 22, 2015 was reckless and malicious, and public officer immunity therefore does not apply to her conduct.

291.    At the time of the events that occurred from March 20 through May22 of 2015, defendants Sanders and Hart owed Rachel and Gourab Sahoo a duty of due care with respect to the exercise of custody and control of their children, including specifically MRS.

292.    At the time of the events that occurred from March 20 through May  22 of 2015, defendants Sanders and Hart owed MRS a duty of due care with respect to respecting and preserving MRS's relationship to her parents.

293.    The duty of due care owed to Rachel and Gourab Sahoo and MRS included, but was not limited to, the following duties:

   a.    To act as a reasonable and prudent social worker under the circumstances;

b.  To ensure that parents were not needlessly deprived of the custody and control of their children;

c.  To ensure that children were not needlessly deprived of the love, support and nurturing of their parents;

d.  To ensure that the exercise of custody and control over a child by the Wake County Department of Human Services was done in accordance with Chapter 7B of the North Carolina General Statutes, including but not limited to preserving and stabilizing the Sahoo family, as required under N.C.G.S. §7B-300;

e.  To ensure that the exercise of custody and control over a child by the Wake County Department of Human Services was done in accordance with the policies of the Wake County Department of Human Services;

f.  To ensure that the exercise of custody and control over a child by the Wake County Department of Human Services was done in a fair, impartial and racially neutral manner;

g.  To ensure that court decisions refusing to grant the Wake County Department of Human Services custody and control over a child were respected; and

h.  To follow the United States Constitution and the Constitution of the State of North Carolina in exercising custody and control over a child

294.  Defendants Sanders' and Hart's conduct as public employees from March 20-May 22, 2015 was negligent, grossly negligent and/or reckless, and breached her duty of due care to Rachel and Gourab Sahoo and to MRS.

295.  Defendants Sanders and Hart acted with malice as a matter of law, and with reckless disregard for the rights of Rachel and Gourab Sahoo and of MRS.

296.  As a direct and foreseeable consequence of defendant Sanders and Hart's

negligence, gross negligence and recklessness between March 20, 2015 and May 22, 2015, Rachel and Gourab Sahoo and MRS have suffered injuries and damages, including but not limited to the following: mental suffering, severe mental anguish, emotional distress, humiliation, indignities and embarrassment, degradation, restrictions on all facets of their parental rights, loss of income, legal fees and other monetary damages, as well as other damages to be determined at the trial of this matter.

## PUNITIVE DAMAGES

297.    Plaintiffs incorporate the allegations made in all of the paragraphs in this Complaint as if fully restated here, and further alleges as follows:

298.    The acts of the individual defendants alleged above were willful and wanton as a matter of law, and evidenced a reckless disregard for and indifference to the rights and safety of the public, including Rachel and Gourab Sahoo, who as a result were deprived of the custody and control of their three children.

299.    The willful and wanton acts alleged above proximately caused the injuries suffered by Rachel and Gourab Sahoo. The Sahoos are therefore entitled to recover punitive damages against the defendants in their individual capacities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Rachel and Gourab Sahoo respectfully request that the Court award relief as follows:

1.    Compensatory damages in an amount greater than $75,000.00, to be determined

at trial;

2.    Punitive damages against the individual defendants in an amount, to be determined at trial, that will deter such conduct by the individual Defendants and others in the future;

3.    Pre-judgment and post-judgment interest and recovery of his costs;

4.    Attorneys' Fees; and

5.    Any and all other relief to which he may be entitled.


RESPECTFULLY submitted this 15th of May 2018.

/s/ David S. Rudolf
David S. Rudolf, NCBN: 8587
RUDOLF WIDENHOUSE
225 East Worthington Avenue
Charlotte, NC 28203
Telephone:  (704) 333-9945
dsrudolf@rudolfwidenhouse.com
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 15th day of May, 2018 I electronically filed the foregoing Fourth Amended Complaint with the Clerk of Court using the CM/ECF system which will send notification of such filing to:

J. Matthew Little
mlittle@teaguecampbell.com

Roger Askew
roger.askew@wakegov.com

Kendra N. Stark
kstark@teaguecampbell.com

Henry Gorham
hgorham@teaguecampbell.com


/s/ David S. Rudolf
DAVID S. RUDOLF