IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:16-CV-153-BO

RACHEL SAHOO and GOURAB SAHOO,            )
                                          )
        Plaintiffs,                       )
                                          )
v.                                        )        O R D E R
                                          )
JAMIE GLEATON, KITTY HART, RICHARD        )
HAYNER, SWEETLY SANDERS, UNKNOWN          )
JOHN DOE SUPERVISORS AND                  )
POLICYMAKERS 1–10, and WAKE COUNTY,       )
                                          )
        Defendants.                       )

This matter is before the Court on defendants' motion for summary judgment. [DE 113]. The parties have also moved to seal certain documents. [DE 124, 137]. Defendants' motion for summary judgment has been fully briefed and the motions are all ripe for disposition. For the reasons that follow, defendants' motion for summary judgment [DE 113] is denied.

## BACKGROUND

On February 24, 2015, plaintiffs called 911 when their five-month-old son, NES, began having trouble breathing and went limp. [DE 114, ¶¶ 15, 18]. A few days earlier, on February 21, plaintiff Rachel Sahoo had taken NES to the Apex WakeMed emergency room because she believed he had contracted a virus. [DE 131, ¶ 8]. On February 23, Ms. Sahoo took NES to his pediatrician, Dr. Gary Dupuy, because of similar concerns about a virus. [DE 114, ¶ 15; DE 131, ¶ 10]. On February 24, NES was transported by ambulance to WakeMed Raleigh, where he was diagnosed with metapneumovirus and admitted to the Pediatric Intensive Care Unit (PICU).

During his stay in the PICU, NES received several tests and examinations, including a CT scan of his head. Initiatially, the results of the CT scan were read as negative. [DE 114, ¶ 4]. On March 4, a re-read of the CT scan of NES's head revealed chronic subdural hematomas. *Id.* Medical staff ordered an MRI that confirmed the presence of chronic subdural hematomas. *Id.* Chronic subdural hematomas are often indicative of non-accidental trauma, including shaken baby syndrome, in non-mobile infants. *Id.* ¶¶ 10, 22.

WakeMed medical staff also observed what they believed to be concerning behaviors in plaintiff Rachel Sahoo's interactions with NES. In particular, nurses and pediatric hospitalist Dr. Jennifer Vick observed that Ms. Sahoo ignored NES, refused to hold him, change his diaper, or otherwise comfort him when he cried, relied on the nurses to care for NES, and appeared distant from him. *Id.* ¶¶ 5, 11, 13. The medical staff's observations, coupled with the results of the CT scan, prompted WakeMed social worker Ryah Koprowski to make a report to Wake County Human Services (WCHS) Child Protective Services (CPS) on the morning of March 6, 2016. *Id.* ¶ 2.

A few hours later, on March 6, defendant Jamie Gleaton, a CPS social worker, arrived at WakeMed hospital and began interviewing plaintiffs and the medical staff. *Id.* ¶ 7. Defendant Gleaton concluded that the interviews with the medical staff were consistent with Ms. Koprowski's report. Defendant Gleaton also believed that plaintiffs were unable to provide an explanation for their son's injuries, other than to describe an incident that had occurred approximately two months earlier in which plaintiffs' 3-year-old daughter, MRS, had pulled NES out of his swing and onto the floor. *Id.* ¶¶ 15, 18. Defendant Gleaton also noted that plaintiffs were NES's only caretakers; plaintiffs dispute this, however, contending that they had also told defendant Gleaton that NES's grandmother, Edith Rotenberg, had taken care of NES since his birth. [DE 131, p. 1–2]. Plaintiffs

2

also state that they had previously provided the same explanation regarding their daughter and the swing incident to Dr. Vick. *Id.*

On the evening of March 6, NES's ophthalmology consult revealed bilateral retinal hemorrhages. [DE 114, ¶ 21]. Retinal hemorrhages and chronic subdural hematomas are two of the most common signs of non-accidental trauma. *Id.* ¶ 22. Defendant Gleaton then consulted with her supervisor, defendant Richard Hayner, and prepared a "Safety Plan" for plaintiffs. More specifically, defendant Gleaton completed by hand a North Carolina Safety Assessment, detailing NES's condition and providing that "Jessica Perry will keep [NGS, NES's twin brother] are her home until next week and she will not allow contact w/ parents. Maternal gma will keep [MRS] w/ her in Florida for now." *Id.* ¶¶ 24–26. Then, also handwritten in the "Safety Response" section beneath the above quote, defendant Gleaton wrote "Parents can not have contact w/ children until further notice by CPS." *Id.* ¶ 26. Plaintiffs signed the Safety Plan that evening and defendant Gleaton verbally explained to them that they were to have no contact with their children until further notice. *Id.* ¶ 27. Plaintiffs, however, dispute that they voluntarily signed the Safety Plan and that it included all of the above terms at the time that they signed it. [DE 131, p. 3].

Plaintiffs left the hospital on the evening of March 6, but plaintiff Rachel Sahoo returned two days later with her neighbor, Jessica Perry, to attempt to see NES. [DE 114, ¶ 28]. Ms. Perry has stated that she received a phone call from a WakeMed nurse authorizing the visit. Plaintiff Rachel Sahoo went to NES's room on the pediatric floor before being asked to leave by Ms. Koprowski, who reported the violation of the Safety Plan to defendant Gleaton. *Id.* ¶¶ 30–32. Defendant Gleaton called defendant Hayner to suggest filing a Petition for Non-Secure Custody. *Id.* ¶ 32.

3

The following day, March 9, defendant Gleaton filed a Petition for Non-Secure Custody with the Wake Country District Court. *Id.* ¶ 33. Judge Keith Gregory granted the petition and entered an order granting WCHS custody of NES and NGS, the twin 5-month-old boys. *Id.* Judge Gregory's order, however, did not specifically authorize WCHS custody of MRS, but noted that she had "been placed with the maternal grandmother pursuant to a safety assessment." [DE 131, p. 3–4]. On March 12, a hearing was held on the need for continuing non-secure custody; plaintiffs were presented and represented by counsel at the hearing. [DE 114, ¶¶ 37–38]. On March 20, Judge Gregory entered a Continuing Order, providing that NES and NGS would remain in WCHS custody. *Id.* ¶ 39. Plaintiffs received supervised visitation with NES and NGS between March 9 and May 22, 2015. *Id.* ¶ 55. Visitation was facilitated by defendants Kitty Hart, a WCHS foster care social worker, and her supervisor, defendant Sweetly Sanders. *Id.*

On May 6, 2015, Dr. Aditee Narayan performed a Child Medical Examination (CME) on NES at Duke Medical Center. *Id.* ¶ 50. On May 21, Dr. Narayan finalized her CME report, concluding that "It is possible that [NES]'s findings are due to underlying or predisposing medical conditions and that they are not necessarily due to abusive head trauma." *Id.* ¶¶ 50–51. Dr. Narayan went on to say that "it is most likely that the findings could be related to benign extra-axial fluid collection/expansion of subarachnoid spaces predisposing NES to bleeding in the subdural space with minor trauma (that may occur in the setting of routine and appropriate care)." [DE 131, p. 6]. The following morning, May 22, WCHS filed a voluntary dismissal of its Petition for Non-Secure Custody and Judge Monica Bousman entered an order dissolving the earlier non-secure custody orders and returning custody of the children to plaintiffs. [DE 114, ¶¶ 52–53]. NES and NGS were in WCHS custody for a total of 74 days, *id.* at ¶ 54, and plaintiffs were effectively deprived of custody of MRS during the same period.

4

In April 2016, plaintiffs initiated this action. [DE 1]. It has since been consolidated and multiple amended complaints have been filed, the most recent in May 2018. [DE 84]. Plaintiffs bring procedural and substantive due process claims under 42 U.S.C. § 1983 against defendants Gleaton and Hayner (Counts I and II) and against defendants Hart and Sanders (Counts III and IV), state law claims of gross negligence against defendants Gleaton and Hayner (Count VI) and against defendants Hart and Sanders (Count VII), and a *Monell* claim against defendant Wake County (Count V). *Id.* In August 2018, following a hearing before the undersigned, the Court denied defendants' motion to dismiss plaintiffs' claims. [DE 103].

In May 2019, defendants moved for summary judgment on all of plaintiffs' claims. [DE 113]. Defendants argue that there are no genuinely disputed issues of material fact and that plaintiffs cannot prevail before a reasonable jury on any of their claims on the evidence presented. Plaintiffs have responded in opposition, arguing that many of defendants' supposed undisputed facts are, in fact, disputed, and that plaintiffs can prevail on their claims as a matter of law. [DE 130]. The parties have also moved to seal their supporting exhibits. [DE 124, 137].

## DISCUSSION

At the outset, for good cause shown, the parties' motions to seal their supporting exhibits are granted.

A motion for summary judgment may not be granted unless there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–

88 (1986). In determining whether a genuine issue of material fact exists, a court must view the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment; "there must be evidence on which the [fact finder] could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). And "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in original). Speculative or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

Defendants' motion for summary judgment must be denied. The Court is persuaded that there are at least three genuine issues of material fact that bear heavily on plaintiffs' § 1983 and gross negligence claims. Given these critical disputes, it would be inappropriate to grant summary judgment to defendants, and as such, defendants' motion must be denied.

First, defendants' position on plaintiffs' constitutional claims as to the period from March 6 to March 9 necessarily depends upon plaintiffs consenting to separation from their children. "The rights to conceive and to raise one's children have been deemed 'essential,' *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), 'basic civil rights of man,' *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942), and '[r]ights far more precious . . . than property rights,' *May v. Anderson*, 345 U.S. 528, 533 (1953)." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). Parents possess a fundamental constitutional right to raise their children and "to remain together [with their family] without the coercive interference of the awesome power of the state." *Hodge v. Jones*, 31 F.3d 157, 163 (4th Cir. 1994); *see also Weller v. Dep't of Soc. Servs. for Baltimore*, 901 F.2d 387, 395 (4th Cir. 1990)

6

(recognizing that the "private, fundamental liberty interest involved in retaining the custody of one's child and the integrity of one's family is of the greatest importance"). Given this important interest, to be provided with due process of law, a parent is entitled to a pre-deprivation hearing before substantially interfering with a parent's custody of a child. *See Weller*, 901 F.2d at 395–96. A post-deprivation hearing is only acceptable when "emergency action is necessary to avert imminent harm to a child." *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 343 (4th Cir. 1994).

Here, at least from March 6 to March 9, defendants substantially interfered with plaintiffs' custody of their three children without holding a pre-deprivation hearing. Pursuant to the Safety Plan, plaintiffs were informed that they could have no contact with their three children, and plaintiff Rachel Sahoo was barred from visiting her 5-month-old son, NES, at the hospital on March 8. Defendants contend, however, that no constitutional violation occurred because plaintiffs signed the Safety Plan on March 6. But, with respect to the Safety Plan, genuine issues of material fact remain. In defendants' view, plaintiffs' signatures on the Safety Plan constitute consent to all of its terms, and those terms extend to an indefinite bar on contact between plaintiffs and their children. Plaintiffs argue, however, that they did not voluntarily sign the Safety Plan, but were coerced by defendant Gleaton and believed they had no choice but to sign it. Plaintiffs also argue that, at the time they signed the Safety Plan, it did not include the hand-written term that barred them from any contact with their children until further notice. In short, there seriously disputed issues of material fact continue to surround the Safety Plan, and viewing the facts in the light most favorable to plaintiffs, the Court finds that summary judgment in favor of defendants would be inappropriate at least as to Counts I and II.

Second, as to plaintiffs' constitutional claims against defendants Hart and Sanders in the period from March 6 to May 22, the Safety Plan is of similar importance. Defendants contend that

the Safety Plan provided the central authorization for WCHS's constructive custody of MRS, who was not subject to Judge Gregory's Non-Secure Custody Order. Defendants argue that Judge Gregory's March 9 order incorporated the Safety Plan but this, too, is disputed. Defendants argue that the Safety Plan remained in effect in the weeks and months that followed because, even after retaining counsel, plaintiffs never repudiated it; plaintiffs argue that the Safety Plan did not remain effective and should not be interpreted as constituting so broad an authorization to WCHS. Plaintiffs effectively argue that, separate and apart from concerns about the validity of WCHS custody of NES and NGS, WCHS had constructive custody of MRS that was not justified by the Safety Plan or any court order. In light of the parties' material factual disputes over the scope and effect of the Safety Plan, as well as the incorporation of the Safety Plan into Judge Gregory's March 9 order, summary judgment in defendants' favor on Counts III and IV would be inappropriate.

Third, there are genuinely disputed issues of material fact that relate to Counts V, VI, and VI. Chiefly, these claims depend upon a variety of written policies at both the state and county level that defendants are alleged to have violated. In Count V, plaintiffs allege that Wake County engaged in a practice of violating the written policies of the North Carolina Department of Health and Human Services (NC DHHS), maintained a policy of removing all children from parents' custody based on unconfirmed suspicions of abuse against one child, and failed to adequately train and supervise its employees. "[A] municipality is liable under § 1983 if it follows a custom, policy, or practice by which local officials violate a plaintiff's constitutional rights." *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 402 (4th Cir. 2014). But individuals "who have final policymaking authority may by their actions subject the government to § 1983 liability." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). In fact, liability can even be imposed "for a

8

single decision by municipal policymakers . . . whose acts or edicts may fairly be said to represent official policy." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). And "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Hunter v. Town of Mocksville*, 897 F.3d 538, 554 (4th Cir. 2018).

Here, plaintiffs argue that defendants' actions in this case were approved by either Regina Petteway, the WCHS director, or the head of CPS, Regina King. Plaintiffs also have submitted evidence of a number of violations of NC DHSS policy committed by defendants. Defendant Wake County's contentions that it is entitled to summary judgment on Count V because "plaintiffs failed to designate any expert witnesses" and presented "no evidence" of policy violations or a pattern or practice of taking custody of all children are generally unpersuasive, but the contention that "it is clear from the record that WCHS did not take custody of all three Sahoo children" rings particularly hollow. [DE 115, p. 17–18]. There are genuine disputes of material fact as to whether defendants violated established policies and procedures and as to whether Wake County had a policy or practice as plaintiffs allege. As such, it would be inappropriate to render summary judgment for defendants on Count V.

Defendants' arguments regarding plaintiffs' state-law claims of gross negligence and reckless depend upon the assertion of immunity. For the reasons stated above, genuine issues of material fact remain as to whether the individual defendants violated state and county policies and were reckless in their handling of the events of 2015, so summary judgment would be inappropriate unless defendants are immune. But even the issues of immunity depend upon questions of fact that the parties dispute.

Defendants first claim that they are entitled to public official immunity. "A public official can only be held individually liable for damages when the conduct complained of is malicious, corrupt, or outside the scope of official authority." *Hunter v. Transylvania Cty. Dep't of Soc. Servs.*, 207 N.C. App. 735, 737, 701 S.E.2d 344, 346 (N.C. Ct. App. 2010). When social workers are "performing a duty designated by statute," they are considered public officials. *Hunter*, 207 N.C. App. at 740; 701 S.E.2d at 348. Defendants next assert that they are entitled to qualified immunity, which protects public officials performing discretionary functions "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Qualified immunity "shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).

As to public official immunity, whether defendants were actually acting pursuant to any statute, and if so, whether their conduct was nonetheless outside the scope of their official authority, involves disputed questions of North Carolina law and policies. For example, defendants contend that defendants Gleaton and Hayner were acting as public officials pursuant to N.C. Gen. Stat. § 7B-500 when they took custody of plaintiffs' children on March 6. But § 7B-500(a) only allows temporary custody if "there are reasonable grounds to believe that [1] the juvenile is abused, neglected, or dependent" *and* [2] "that the juvenile would be injured or could not be taken into custody if it were first necessary to obtain a court order." N.C. Gen. Stat. § 7B-500(a). Defendants do not appear to argue that, on March 6, CPS reasonably believed that NES (who was hospitalized at the time), NGS, and MRS (who was in Florida with her grandmother at the time) would be injured or could not be taken into custody if CPS was forced to first obtain a court order. Plaintiffs

10

similarly argue that defendants Hart and Sanders were not acting pursuant to any statutory authority in exercising control over MRS between March 20 and May 22. Again, these issues are inseparable from the underlying factual disputes in this case. And as to qualified immunity, the law was clearly established that "the integrity of one's family is of the greatest importance" and "a parent is entitled to a hearing initiated by the State before he may be deprived of the custody of his child." *Weller*, 901 F.2d at 394, 398 (citations omitted). Indeed, "only where a child's life is in imminent danger or where there is imminent danger of severe or irremediable injury to the child's health . . . may an official summarily assume custody of a child from his parents. *Jordan ex rel. Jordan*, 15 F.3d at 346. The law was clearly established and defendants' actions were allegedly incompatible with it. Given the disputed facts in this case, and construing the evidence in plaintiffs' favor, defendants are not entitled to qualified immunity at this time. Defendants are not entitled to summary judgment in their favor on Counts VI or VII.

In sum, the Court finds that there are a variety of genuinely disputed material facts that bear on all of plaintiffs' claims in this action. These disputed facts principally involve the March 6 Safety Plan, in terms of its scope and the voluntariness of plaintiffs' consent, the extent to which the Safety Plan was incorporated in Judge Gregory's March 9 order, and the purported incompatibility of defendants' actions with state and county policies and procedures. Construing these factual disputes in favor of plaintiffs, the non-moving party, the Court is compelled to find that a reasonable jury could return a verdict for plaintiffs on the evidence presented. As such, it would be improper to grant summary judgment in favor of defendants at this stage. Defendants' motion for summary judgment is, therefore, denied.

Further, pursuant to 02-JP-1-BO, the jury trial in this matter shall commence on September 3, 2019 in Raleigh, North Carolina.

11

## CONCLUSION

For the reasons discussed above, defendants' motion for summary judgment [DE 113] is DENIED. The parties' motions to seal [DE 124, 137] are GRANTED. The Clerk is DIRECTED to maintain DE 116–22 and DE 133–36 under seal. The jury trial in this matter shall commence on Tuesday, September 3, 2019 at 10:00 a.m. at the United States Courthouse, 310 New Bern Avenue, Raleigh, North Carolina.

SO ORDERED, this **31** day of July, 2019.

*Terrence Boyle*
TERRENCE W. BOYLE
CHIEF UNITED STATES DISTRICT JUDGE